ADMIRAL CORPORATION, Appellant,

v.

ZENITH RADIO CORPORATION, Appellee.

No. 6592.

United States Court of Appeals
Tenth Circuit.

Nov. 15, 1961.

Howard Clement, Chicago, Ill. (Cochran, Dudley, Fowler, Rucks, Baker & Jopling, Oklahoma City, Okl., and Charles L. Byron, Chicago, Ill., of counsel, on the brief), for appellant.

Dugald S. McDougall, Chicago, Ill. (V. P. Crowe, Oklahoma City, Okl., and Francis W. Crotty, Chicago, Ill., on the brief), for appellee.

Before MURRAH, Chief Judge, and LEWIS and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Appellee, Zenith Radio Corporation, sued appellant, Admiral Corporation, claiming infringement of its United States Patents Nos. 2,817,025, 2,821,954, 2,821,955, and 2,821,956 (hereinafter referred to as 025, 954, 955 and 956 respectively) relating to various features of a remote-control system for television receivers, and also of Patents Nos. 2,814,-671 and 2,915,583 relating to certain television circuits. In a counterclaim Admiral asserted infringement of its Patent No. 2,498,333 covering a spindle used in automatic record changers. The trial court found that all the Zenith patents were valid and had been infringed by Admiral. On the counterclaim the court ruled that Zenith had not infringed the Admiral patent. The appeal has been withdrawn as to the television circuit and spindle patents. There remain for our consideration the issues relating to the remote-control patents 025, 954, 955, and 956. In the trial court Admiral contended unsuccessfully that as to each of these there was neither invention nor infringement and that Zenith is barred by unclean hands from reliance thereon.

The term "remote control" as applied to a television set means an arrangement whereby a viewer seated at some distance from the set can change channels, change the sound level, or turn the set on or off

without approaching the set. Such control is desirable because the viewer is usually more than arm's length away. Over the years various remote-control devices have been developed for radio and television receivers. These employed wire connections, radio waves and light waves. None were commercially successful. The Zenith research department, after much work and with great ingenuity, produced a small, hand-held, push-button operated transmitter in which ultrasonic sound waves were actuated to communicate instructions from the viewer to the set. Finger pressure on the button generates the ultrasonic impulse which is picked up by a microphone in the set and converted to an electrical impulse. This is amplified and its frequency detected with the result that a particular relay is operated to adjust the set according to the viewer's whim. This system, which Zenith calls "Space Command" is truly integrated as each component cooperates uniquely with the other components to provide dependable, trouble-free operation. The great advantage of the ultrasonic system over a system operated by radio waves is that ultrasonic signals do not pass through walls as do radio waves. This prevents interference between ultrasonic remote-control devices used with other television sets whereas radio devices may cause interference.

The Zenith research program which resulted in the Space Command system occurred between October, 1955, and March, 1956. The product was introduced to the public in the summer of 1956, was well accepted, and met with commercial success. In mid-1957, Admiral came on the market with its "Son-R" ultrasonic remote-control device. The trial court held that Son-R was "a direct copy of Space Command." Son-R also met with success and contributed impressively to Admiral's television sales.

The lawsuit was a battle of experts. Two of the inventors of the devices covered by the patents on which Zenith relies and one inventor of a prior-art patent cited by Admiral testified along with a coterie of electronic, mechanical, and legal experts. Diverse opinions expressed by them on a variety of technical subjects presented a problem of great difficulty to the trial court. That court gave credence to the evidence of Zenith and made comprehensive findings of fact which reflect a thoughtful and patient consideration of the complex issues.

The primary question is the validity of the Zenith patents. Admiral asserts anticipation by prior art and obviousness to one of ordinary skill in the art as defenses to the validity of the Zenith patents.

The remote-control systems in suit require a hand-held transmitter producing an ultrasonic signal of a predetermined frequency and a receiver which converts the sound wave to an electric impulse which in turn operates a control on the television set. The ultrasonic sound is produced by striking the end of a small, cylindrical, aluminum rod with a hammer so as to cause a signal having a frequency in the range of 40,000 cycles per second. The 954, 955, and 956 patents of Zenith relate to the transmitter and the 025 patent to the receiver.

The basic Space Command transmitter structure is covered by the 955 patent which discloses an ultrasonic transmitter using a mechanical resonator to generate a signal and an improved device for imparting mechanical energy to the resonator element. The resonator rod is mounted at its nodal plane and is struck on its end by a spring supported hammer which delivers a relatively powerful, single blow. The hammer is actuated manually by either a sliding or piano-key type push button. Successful operation requires a sharp hammer blow produced by a light finger movement resulting in only one impingement on the rod.

One of the problems involved in the transmitter is the mounting of the resonator rod in such a manner that there will be a minimum of vibration absorption. This mounting must be rugged enough to withstand abuse, and the method employed in the mounting must be simple enough to permit economical man-

ufacture. The mounting disclosed in the Zenith 956 patent accomplishes these results. It uses a spring wire anchored on a rigid metal bracket and bent into a rectangular shape so that the two longest opposite sides are spaced apart by a distance slightly less than the rod diameter. Diametrically opposed narrow grooves are cut in the resonator rod along its nodal plane and the rod is snapped into position between opposing sides of the spring wire. The spacing is such that the sides bow when the rod is forced between them and hence they contact the rod only at a limited number of spaced points. In the preferred form of the 956 patent the grooves are so made that there is contact only at the ends of each slot. The rod is firmly held against both longitudinal and lateral dislodgement and the contact area is so small that the mounting has only a limited effect on the vibration of the rod.

The duration of the ultrasonic command impulses must be so controlled that the relays in the receiver will operate only once in response to each command. The 954 patent accomplishes this result by a mechanism which causes automatic damping, i. e. suppressing, of the rod vibrations when the push button is released. The damping effect is obtained by the application of a metal element, such as a spring wire, to the side of the rod upon release of the push button with provision made for holding the damping element away from the rod while the push button is depressed.

Admiral asserts that patent 955 covering the transmitter structure discloses essentially a manually activated chime with a particular form of mechanism for striking the vibrating element. Admiral cites as prior art the Treanor Patent No. 1,357,915, the Connell Patent No. 186,416, and the White Patent No. 2,728,902. Of these only the White patent was mentioned in the Patent Office references.

The Connell patent, granted in 1877, covers a manually operated door bell in which finger pressure on a push button causes the bell to ring. It did not make use of a longitudinal-mode vibrator, did not generate a specific ultrasonic frequency, and contained no means for insuring single hammer impact from each button actuation. The Treanor patent relates to bell signals primarily designed for use in mines. It provides a transverse-mode rather than longitudinal-mode vibrator and would give off a variety of different tones and pitches. It did not provide an arrangement of the hammer in conjunction with the hammer stem so as to assure but one impact for each stroke of the hammer. We are not impressed with the argument that either Connell or Treanor is at all pertinent to Zenith 955. More pertinent is the White patent which will be discussed later.

To support its claim of invalidity of the 956 patent relating to the rod mounting, Admiral relies on the mentioned White patent which was cited in the Patent Office references, the Rowe Patent No. 2,516,725, the Lutzens Patent No. 2,304,-835, and an article in Physics magazine. We pass the White patent for the moment. Rowe discloses a musical instrument containing metal rods suspended by strings looped around the rods which were not longitudinal-mode vibrators. Rowe did not suggest the use of spring wires for rod mounting. Lutzens refers to the art of mounting piezoelectric crystals. Instead of spring wires it uses ordinary wire conductors which in addition to supporting the crystal act as electric conductors for carrying current to the plated conductive surfaces of the crystals. Lutzens did not suspend the vibrating element between taut, bowed, spring wires so as to have a minimum effect on vibration and was necessarily concerned with a firm electrical contact. If the same mounting technique was used on the sound-generating rod here involved, the contact points would be at the points of greatest vibration and not at the nodal plane as previously described. The magazine article presents the results of investigations of energy dissipation in vibrating solids. The rods used were supported by a sling arrangement of thin piano wires. The sling mounting touched the rod continu-

ously around the major part of its circumference. Rowe, Lutzens, and the magazine article do not disclose the combination of a grooved rod and spring-wire support contacting the rod at a limited number of spaced points at its nodal plane, holding the rod firmly without appreciable effect on its vibrations, and capable of economical assembly. None of them anticipates the 956 device. We agree with the trial court and the Zenith experts that there is nothing disclosed in these references which would make the 956 device obvious to one trained in the art.

The idea of damping as achieved by the 954 patent is not new. It is accomplished with some musical instruments by grasping the vibrating element with the hand after the sound has been produced. The novelty of 954 is said to lie in the method of attaining the damping result. Admiral cites as prior art the White patent which here again was cited in the Patent Office references, the Morris Patent No. 1,490,476, the Gardiner Patent No. 2,167,-600, and the Rest Patent No. 2,512,777. The Morris patent covers a door chime and the Gardiner and Rest patents relate to musical instruments. None of them discloses a longitudinal-mode vibrator with a push-button operated sequential side damper. None of them anticipates the 954 patent and none teaches anything which might make 954 obvious to the skilled individual familiar with the art.

We come then to the White patent which was cited as a reference by the Patent Office examiner in connection with each of the 954, 955, and 956 patents. The White patent relates to ranging and detection of objects by receipt of echoes of ultrasonic pulses and methods and apparatus for producing such pulses. It discloses an ultrasonic generator employing a longitudinal-mode cylindrical vibrator which is hit on the end by a motor-driven hammer. In the White rod mounting the rod is provided with circumferential grooves in its nodal plane and is held in place by a pair of clamping ribs curved to fit tightly in the grooves. This type of mounting was tried by both Zenith and Admiral engineers and was discarded because of interference with rod vibration. White damps rod vibrations by an end damper consisting of a ring of felt, rubber or cork with a hole in the center through which the hammer passes to strike the rod end. The damping element is mechanically actuated so as to be removed from the rod end when the hammer blow is struck and to contact the rod end shortly after the blow. Less pertinent in White is the disclosure of a stationary vibration-absorptive ring permanently clamped onto the rod some distance from the end, the effect of which is to reduce rod vibrations at all times, even at the instant of hammer impact.

 Congress has said that a duly issued patent shall be presumed to be valid and that the burden of establishing invalidity is on the party who asserts it.[1] The presumption of validity is strengthened in cases where the developments relied on to show anticipation were before the Patent Office.[2] The presumption is rebuttable and the ultimate question of validity is one of law for the court to decide.[3] To be patentable a product or process must not only be a new and useful improvement over the prior art but also it must not be obvious to one of ordinary skill in the related art.[4]

The problem presented is whether the White patent anticipates the Zenith transmitter patents 954, 955, and 956 or makes the Zenith devices obvious to one of ordinary skill in the art. The purpose of White is to provide methods and means

1. 35 U.S.C. § 282.

2. Bewal, Inc. v. Minnesota Mining and Manufacturing Company, 10 Cir., 292 F. 2d 159, 164.

3. Philip Sitton Septic Tank Company v. Honer, 10 Cir., 274 F.2d 811, 813; Consolidated Electrodynamics Corp. v. Mid-western Instruments, Inc., 10 Cir., 260 F.2d 811, 815.

4. 35 U.S.C. § 103; Wagner Iron Works v. Koehring Company, 10 Cir., 282 F.2d 317, 322; Doran Coffee Roasting Co. v. Wyott Manufacturing Co., 10 Cir., 267 F.2d 200, 202.

of detecting objects and of determining the range of the objects detected. The purpose of the Zenith patents is to provide a means of operating a television set by remote control. Diverse as are these purposes the result is obtained through the use of an ultrasonic generator consisting of a cylindrical metal rod which emits the desired impulses when struck on the end by a hammer together with a sequential damper which stops the impulse at an optimum time.

Admiral contends that the Zenith patents cover no more than an aggregation of the elements disclosed by White and that the development of the Zenith devices was obvious to one skilled in the art.

A mere aggregation of old elements is not patentable when the respective individual functions of the assembled elements are not changed and produce no result other than the added results of such functions. A combination of old elements is patentable if it accomplishes either a new result or an old result "in a more facile, economical, and efficient way in a particular environment which presented peculiar and difficult problems." [5]

In both the White and the Zenith patents ultrasonic waves are produced by a resonator rod struck on the end with a hammer and the rod is subsequently mechanically damped. While the functions performed by these elements are the same, Zenith has adapted them to obtain an old result, the transmission of ultrasonic sound impulses, in a more facile, economical and efficient way within a new and highly specialized environment presenting unusual and formidable difficulties. This has been accomplished by novel and ingenious developments permitting commercially successful manufacture. The basic transmitter structure covered by 955 is a compact, hand-held, finger-operated device which differs strikingly from the more complex motor-driven apparatus of White. The rod mounting disclosed by 956 has a superiority over that used by White as is shown by the inability of both the Zenith and Admiral engineers to adapt the White type of mounting for their uses. White employs a mechanically elaborate end-damping arrangement whereas the metallic side damper disclosed by 954 avoids all problems of interference between the hammer and the damper, is simple in operation, and less expensive to manufacture.

With full recognition of the rule that "the concept of invention is inherently elusive when applied to combination of old elements" and that "courts should scrutinize combination patents with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements," [6] we find in the Zenith 954, 955, and 956 patents substantial innovations which have been produced by inventive genius and which add to the sum of useful knowledge. [7]

Admiral insists that the Zenith devices are improvements which would be obvious to the skilled individual. The weakness of this argument lies in the fact that there had long been a demand for a remote-control system to operate television sets and the research facilities of the industry, in spite of many and continuing efforts, failed to make a commercially successful system until Zenith produced its Space Command. As we said in Harris v. National Machine Works, 10 Cir., 171 F.2d 85, 88, " * * * the

5. Consolidated Electrodynamics Corp. v. Midwestern Instruments, Inc., supra, 274 F.2d p. 816, quoting Oliver United Filters v. Silver, 10 Cir., 206 F.2d 658, 662, certiorari denied 346 U.S. 923, 74 S.Ct. 308, 98 L.Ed. 416; Hutchinson Mfg. Co. v. Mayrath, 10 Cir., 192 F.2d 110, 112, certiorari denied 343 U.S. 914, 72 S.Ct. 647, 96 L.Ed. 1329.

6. Great Atlantic and Pacific Tea Company v. Supermarket Equipment Corp., 340 U.S. 147, 151, 152, 71 S.Ct. 127, 95 L.Ed. 162.

7. Consolidated Electrodynamic Corp. v. Midwestern Instruments, Inc., supra, 274 F.2d p. 817.

fact that, viewed in retrospect, a conception seems simple, does not justify denial of inventive genius where the need for the device long existed and the solution of the problem did not occur either to mechanics skilled in the art or to experts in the * * * field."

█ Other reasons sustain this conclusion. On conflicting evidence the trial court held that the devices covered by the Zenith patents would not have been obvious to one of ordinary skill in the art. This is a finding of fact which cannot be set aside as clearly erroneous. Further, the White patent was cited as a reference by the Patent Office on each of the Zenith transmitter patents in suit and this enhances the presumption of validity.[8] Zenith's Space Command met with immediate and impressive commercial success. While such success cannot bridge the gap between mechanical skill and invention,[9] it strengthens the presumption of patent validity.[10] In the circumstances Admiral has not sustained the burden of overcoming the presumption of validity by clear and convincing evidence.[11] We hold that the Zenith 954, 955, and 956 patents are valid.

The 025 patent covers the receiver in the Space Command remote-control system. Its function is to control the operation of electrical switches which in turn operate the electrical devices which turn the set on or off, change the channel, or mute the sound. Basically, the 025 patent involves a receiver circuit which, in combination with a microphone and amplifier, includes a limiter, a frequency discriminator, an integrator circuit, and a uniquely biased relay-control tube. The successful operation of such a receiver requires rejection of spurious sounds and response to signals of the desired frequency even though interrupted. Spurious actuations may arise from such common-place occurrences as the jangling of keys or the tinkling of glasses. Interruptions may occur from other sounds or from momentary cancellation by echoes.

While Zenith contends that the 025 circuit is new in concept, structure and result, it relies primarily on two areas of claimed novelty. These are referred to as the duty cycle circuit and the two-output dual-function discriminator circuit. Admiral contends that each was anticipated by prior art and was obvious to those skilled in the art.

Duty cycle is an engineering phrase defined by one witness as meaning time on versus total time. If the circuit is designed for an uninterrupted signal of one second in length, the duty cycle is 100% whereas if the signal length is one second and the circuit will tolerate interruptions for half that time, the duty cycle is 50%. This factor is important because of the prevalence of other ultrasonic sounds which might either actuate the relays or interfere with actuation upon the receipt of a signal from the transmitter. The 025 circuit is so designed as to operate on a signal of less than one second duration with a 60% duty cycle.

To support its contentions with regard to the duty cycle, Admiral relies on the Andrews Patent No. 2,739,273 for a garage door opener in which an ultrasonic signal is produced by a whistle attached to a car engine and received by an apparatus containing the essential elements of the 025 patent such as microphone, amplifier, limiter, discriminator, and integrator. The Andrews circuit requires for relay operation a continuous, uninterrupted signal of 3 seconds duration. Admiral says that the different characteristic of the 025 circuit is obtained merely by adjustment of a voltage called "bias" on a relay-control tube and by the adjustment of conventional circuit elements to accomplish a slow rate of charge and discharge in the integrator

---

8. Bewal, Inc., v. Minnesota Mining and Manufacturing Company, supra, 292 F. 2d p. 164.

9. Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973.

10. Oliver United Filters v. Silver, supra, 206 F.2d pp. 663–664.

11. Jamco, Incorporated v. Carlson, 10 Cir., 274 F.2d 338, 341–342.

portion of the circuit. Admiral argues that this is a difference in degree which would be obvious to one trained in the art. Expert witnesses for Zenith testified that the 025 duty cycle performs a new function by obtaining noise immunity concurrently with receiver operability in response to interrupted signals and is a novel, desirable, and useful contribution to the art. Certain it is that the Andrews patent did not attain and was not intended to attain the result which the 025 patent has obtained.

In further support of the 025 patent Zenith emphasizes its disclosure of a dual-frequency discriminator having two output connections respectively feeding two different relay-control tubes controlling different and independent functions. While conceding that the discriminator circuit was old in the art, Zenith insists that the use of a single-frequency discriminator for two control channels was without precedent and achieved a desirable result by reducing the total number of parts required for a multi-channel receiver.

Admiral contends that this feature of 025 was anticipated by the Alexandersson Patent No. 2,320,996 and would have been obvious to one trained in the art. Alexandersson covers a remote-control system and uses a frequency discriminator circuit having two output connections. The difference is that in Alexandersson the two output connections feed the same amplifier and cooperate to achieve a single control function whereas in 025 each of the two output connections carries a separate control signal to separate load devices each of which is independently operable without the other.

The legal principles heretofore noted in connection with the transmitter patents have application to the 025 receiver patent except that the failure to cite Andrews and Alexandersson as prior-art references removes from the presumption of validity the strengthening support which comes from consideration of such prior art by the Patent Office. The 025 patent is a combination of old elements and the claim of invention must be scru-tinized with care in conformity with the rules previously stated.

Inventor Andrews testified that the duty cycle of 025 was quite different from the time delay present in his circuit and that 025 could tolerate momentary interruptions while his circuit could not. Admiral's witness Cawein stated that the Andrews device could be given a duty cycle like 025 if a certain circuit element were increased in magnitude by a factor of 33,000 times. Zenith's expert Johnson testified without contradiction that this change would destroy the Andrews receiver's immunity to noise and would cause it to open garage doors in response to squeaking brakes and other street noises.

A study of the complex circuits and a review of the testimony of the technical experts leave no doubt that here we are dealing with a particular and unusual environment in which the problems are peculiar and difficult. This situation bears no resemblance to the extension of the grocery counter which was considered in the Great Atlantic & Pacific Tea Company case, the change in shape of pole pieces and in mechanical adjustment found in the Consolidated Electrodynamics case, or the use of bolts smaller in diameter than the holes through which they extended as was the novelty claimed in the Wagner Iron Works case. Patent 025 makes such changes in the labyrinthian maze of an electrical circuit that the desired response is obtained with an interrupted signal, whereas Andrews requires an uninterrupted signal. By providing a two-output discriminator, 025 achieves a reduction in the number of essential parts for a multi-channel receiver with resulting economy and efficiency.

Here, if ever, is a case involving the proper interpretation and application of expert testimony. The opinion of the trial court and its findings of fact and conclusions of law display an understanding of the problems and a careful evaluation of the testimony. Not only are we convinced that such findings cannot be upset under the clearly erroneous rule but also that such findings are correct.

An old result (the operation of electrical relays in response to ultrasonic sound signals) is obtained in a new and efficient way (a circuit which has noise immunity and yet responds to an interrupted signal) which expertly and economically makes use of fewer parts. It accomplishes this in an environment where research experts had tried for years to solve the difficult and peculiar problems presented. In our opinion the 025 patent is valid.

Admiral contends that the Space Command patents are not enforceable by Zenith because the Zenith patent solicitors filed and prosecuted the application which matured in the 025 patent without bringing to the attention of the Patent Office the prior Andrews patent and hence Zenith comes to court with unclean hands.

The facts as found by the trial court are that the subject matter of the 025 patent was first presented to the Patent Office in April, 1956, as part of the patent application which ultimately became the 954 patent. At that time the Zenith solicitors were unaware of the Andrews patent. In early 1957 the Patent Office ruled that the 1956 application included two distinct areas of invention which required the division of the application. In August, 1957, the divisional application which ultimately became the 025 patent was filed with claims drawn on the Adler remote-control receiver circuit. Sometime between June 19 and August 4, 1957, Zenith learned through its service department of the Andrews remote-control system for operating garage doors and a patent check disclosed the Andrews patent. The Zenith solicitors then reviewed the Andrews patent and satisfied themselves that the 025 claims were distinguishable. The divisional application was filed without reference to the An-

drews patent and it was allowed by the Patent Office on the first official action. There is no evidence in the record as to whether the Andrews patent was actually considered by the examiner who allowed the 025 patent.

The courts will deny relief to a patentee who has behaved unethically in his dealings with the Patent Office in connection with a patent in suit.[12] Here the misconduct is based upon the alleged concealment of the Andrews patent. Difficult as it is to understand how Zenith could conceal from the Patent Office the Andrews patent which was a public record and which had been issued shortly prior to the Zenith 025 divisional application,[13] we nevertheless have considered the charge of misconduct. Admiral identifies the Andrews circuit with the 025 circuit on the basis of block diagrams of sufficient generalization to have the systems appear alike. We agree with Zenith that while block diagrams have some utility in the electronic art as a short-hand portrayal of an overall system, they are incapable of disclosing the refinements that distinguish one circuit from another intended for the same general purpose.[14] The significant differences between Andrews and 025 have been pointed out. The solicitors for Zenith testified as to their good faith belief as to the differences. This is not a case of a prior public use of which the Patent Office had no means of gaining information except through the applicant.[15] Here the alleged nondisclosure relates to a significantly different prior patent. If an applicant knows of prior art which plainly describes his claimed invention or comes so close that a reasonable man would say that the invention was not original but had been anticipated, he will not be excused for failure to disclose his knowl-

---

12. Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 819, 65 S.Ct. 993, 89 L.Ed. 1381; Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250.

13. The Andrews patent issued March 20, 1956, and the Zenith application which resulted in 025 was filed August 5, 1957.

14. Boley Andrews, the inventor of the patent bearing his name, admitted this.

15. Cf. Triumph Hosiery Mills v. Alamance Industries, Inc., D.C., 191 F.Supp. 652.

edge.[16] This case falls outside of that rule. The record sustains the findings of the trial court that the Zenith solicitors acted in good faith and were under no professional obligation or moral duty to call the Andrews patent to the attention of the Patent Office while the application which resulted in 025 was pending.

Little need be said on the question of infringement. The court found that the Admiral Son-R was a direct copy of the Zenith Space Command. No other finding was possible in view of the testimony of the Admiral engineers that pursuant to directions from Admiral management they made a straight copy of the Zenith system. Admiral justified this conduct on the ground that the Zenith patents were not valid. Our decision that they are valid disposes of the contention.

One point remains to be considered. Admiral urges that the 1960 model remote-control transmitter used in Son-R does not infringe on patent 956 relating to the mounting of the resonator. Noninfringement is claimed on the ground that the 1960 mounting used a circumferential groove rather than diametrically opposed flat-bottomed grooves with a resulting two-point suspension rather than four-point as employed in the preferred 956 design. The trial court held that this was an imperfect utilization of the 956 patent with the hope of evading infringement while enjoying the major benefits of the teachings of 956. A device may infringe a patent even when it does not utilize fully the best mode of practicing the invention. We have said that impairment of function and lessening of result in degree only does not avoid infringement.[17]

Appellant's motion to dismiss the appeal from those parts of the judgment relating to United States Patents Nos. 2,498,333, 2,915,583, and 2,814,671 is granted. The appeal is dismissed as to those patents. On all remaining issues the judgment is affirmed.

---

16. United States v. Standard Electric Time Co., D.C., 155 F.Supp. 949, 952, appeal dismissed 1 Cir., 254 F.2d 598. That decision points out that it is not the object of the disclosure rule "to force the applicant to set up what he regards in good faith as straw men which he reasonably and in good faith believes he can knock down."

17. Williams Iron Work Co. v. Hughes Tool Co., 10 Cir., 109 F.2d 500, 503.