**ESCO CORPORATION, Plaintiff,**

v.

**HENSLEY EQUIPMENT COMPANY,**
**Inc., Defendant.**

**No. 39806.**

United States District Court
N. D. California, S. D.

Sept. 8, 1965.

---

Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., Dawson, Tilton, Fallon & Lungmus, Jerome F. Fallon, Chicago, Ill., for plaintiff.

Flehr and Swain, San Francisco, Cal., for defendants.

## MEMORANDUM OPINION AND ORDER

ZIRPOLI, District Judge.

Esco Corporation, the plaintiff, is an Oregon corporation, located at Portland, Oregon. It also maintains a plant at Danville, Illinois. Esco's business includes, among other things, the manufacture and sale of expendable products for construction equipment, such as excavating teeth and replacement points for those teeth.

Hensley Equipment Company, Inc., the defendant, is a California corporation, located at San Leandro, California. Defendant is also engaged, among other things, in the manufacture and sale of excavating teeth and replacement points for those teeth. Defendant sells its products through various dealers in the United States, and among those dealers is one W. M. Hales Company, Inc., of Danville, Illinois, which latter company, in addition to being a dealer, is also an independent warehouse operator and operates a warehouse at Danville not only for the benefit of defendant, but also for other manufacturers.

This suit was brought on United States Letters of Patent 2,483,032, hereinafter called the "Baer Patent", and under the Patent Laws of the United States (35 U.S.C. §§ 271, 281; 28 U.S. C. §§ 1338(a), 1400).

The subject matter of the Baer Patent is an excavating tooth. Excavating teeth are metal devices which fit on the front or digging edges of dippers, shovel buckets and the like and serve to aid in the penetration and breaking up of earth or rock in which such equipment is working. The particular type of teeth concerned in this suit are two-part excavating teeth, including an "adapter" portion and a wedge-shaped wear "point". The point is a separate, relatively small tip that fits on the adapter and provides the actual cutting edge of the overall tooth. The commercial value of such excavating teeth lies in the fact that the point can be easily fitted on to the adapter, maintained securely thereon during the heavy stresses encountered in field operations and yet readily releasable for replacement when worn down or when it otherwise becomes time to replace the point. The resultant savings in man hours and metal have been a boon to the heavy construction industry.

While excavating teeth of a two-part nature were known to the art as early as 1909 (Patent No. 915,809 issued to B. C. Thomas) and had had some limited commercial use in the late Thirties and early Forties, extensive commercial use of such two-part excavating teeth did not commence until about 1945 or shortly thereafter.

The patent in suit, the Baer Patent, of which only claims 5, 8 and 9 are at issue for decision by this Court, was granted on September 27, 1949 to Josef Baer on an application filed in the United States Patent Office on June 6, 1945. Prior to issuance, the application and all rights therein were assigned to Electric Steel Foundry Corporation, which by change of name became Esco Corporation, plaintiff in this suit. Plaintiff is now, and at all times during the commission of the acts complained of by plaintiff has been, the owner of the entire right, title and interest in and to the Baer Patent, including the right to sue for patent infringement.

In the year 1947 defendant started making its own two-part excavating teeth and in the year 1948 it started making replacement points for the teeth of other manufacturers of two-part teeth. These included the Caterpillar type, for which it paid a royalty, H & L type, the patent on which had expired, and Ateco type and Saker type, which latter two types were not patented. About 1960 defendant entered into the manufacture of the Esco (Baer) type replacement points. For this purpose defendant purchased five Esco two-part teeth (points and adapters) in order that it might "capture the dimensions" that are necessary to fit its manufactured Esco type points to the Esco adapters. Defendant, at the time of the purchase of these Esco points and adapters, knew that these pieces carried patent numbers on them. After the defendant had manufactured 109 Hensley-Esco type wear points, Clyde Hensley, the President of defendant corpora-

tion, received a visit from Hal Robb of the plaintiff corporation, who said to him, "Oh, you have ears that fit snugly into the recesses of our adapters. You are infringing our patent." (R. 181). Defendant immediately stopped production and made certain changes in the pattern of its Hensley-Esco type points in order to keep the ears (more often described as tongues) of the wear points from fitting snugly into the recesses of the Esco adapter by changing the formation of the tongues in such manner as to provide "an eighth of an inch clearance and a hardened piece of steel." (R. 181). As the witness Clyde Hensley said, "I didn't want to infringe the patent, so I immediately changed so that it didn't interlock." (R. 182). He further testified that he "just changed the shape of the tongues" and made no testing other than to try the new wear points on the adapters to see that there was an eighth of an inch clearance.

It is admitted by the defendant that *if the Baer Patent is valid,* the first 109 points manufactured by defendant infringe claims 8 and 9 of that patent. This admission of infringement of claims 8 and 9 appears from the record in several places. In the pretrial order, approved as to form and content by the defendant, it is provided as follows: "6. The admitted and undisputed facts in the case include: * * * (i) That the defendant has manufactured a small number of points as defined in Claims 8 and 9 of the patent in suit, and that these points infringe said claims if the claims are valid." At the hearing on motion of summary judgment, counsel for defendant admitted that this small number of points infringe the Baer Patent when he said, "We admit that they (referring to these 109 points) would infringe and we also admit that the defendant would be liable for such infringement if the Baer patent were valid.", and during the course of the trial counsel again admitted that these points infringed. In answer to the Court's question, "You have admitted that the first teeth would infringe if a patent ex-

ists", counsel for defendant replied, "Yes, Your Honor, we did." (R. 23).

As to the defendant's subsequently manufactured wear points, plaintiff complains (1) that the manufacture and sale of such wear points *directly infringe claims 8 and 9* of the Baer Patent and (2) that because of defendant's relationship with W. M. Hales Company, Inc. of Danville, Illinois, the *defendant infringed claim 5* of the Baer Patent *by inducement* in that defendant induced W. M. Hales to purchase new adapters from plaintiff and new replacement points from defendant for the purpose of assembling the two together for sale by W. M. Hales as a complete unit.

■ Before turning to claims 8 and 9, which relate generally to the wear point itself and which form the heart of this case, the Court finds that the plaintiff's allegation that defendant infringed claim 5 (which relates to the overall combination of the wear point and the adapter of the Baer Patent) by *inducement* is without substance. The induced party is supposedly W. H. Hales Company of Danville, Illinois; however, there is not the slightest bit of evidence from which one could reasonably conclude that any inducement occurred. Plaintiff appears to be attempting to show an agency relationship between defendant and W. H. Hales Company, but the evidence will not sustain plaintiff's contention:

"MR. HERBERT: Q. Mr. Hensley, Do you know Mr. Herbert Hales?

"A. Yes, I do.

"Q. What is your relationship with him?

"A. He is one of my warehouse outlets in Danville, Illinois, and also a dealer for Hensley Products within his trading area.

"Q. Would you explain what your relationship, or rather, what your business arrangement is with Mr. Hales with respect to warehousing and with respect to his dealership?

"A. Well, we have an arrangement with W. M. Hales Company whereby we pay him a fee for stocking our mer-

chandise and reshipping to other dealers on the eastern seaboard, for which we pay him a warehousing fee and three per cent handling charge for products reshipped for us. Then the other phase of his business as far as we are concerned, he draws from our warehouse and sells direct to the contractors in his trading area, immediately around Danville, Illinois.

"Q. Do other of your dealers draw from that warehouse?

"A. They do.

"Q. You mentioned W. M. Hales Company. How is this related to—

"A. W. M. Hales Company—

"THE COURT: Well, let's start first with, has this always been the relationship?

"THE WITNESS: Yes, it has been, since the—

"THE COURT: It hasn't varied at any time?

"THE WITNESS: No, sir.

"THE COURT: All right.

"THE WITNESS: Well, yes, sir, I might qualify that, because over the years, prior to him becoming a warehousing agent, from time to time he bought other products or products in the Hensley line, on an occasional basis, but not on a regular basis.

"THE COURT: All right.

"MR. HERBERT: Q. And what did you say was W. M. Hales Company?

"A. W. M. Hales is the company of which Herb Hales is the General Manager and President—I assume, although I am not sure he is President.

"Q. But Herbert Hales is connected with W. M. Hales?

"A. He is considered the owner of W. M. Hales Company, yes.

"Q. Have you instructed W. M. Hales Company or Herbert Hales or any one with that company how to sell your points?

"A. No, sir, I have not.

"Q. Have you ever instructed or suggested that your points be sold on new Esco adapters?

"A. No, sir, I have not.

"THE COURT: Did you ever become aware of that fact?

"THE WITNESS: I never became aware of that fact, no, sir.

"THE COURT: Until when?

"THE WITNESS: Until recently when it was testified here by someone.

"THE COURT: Well, were you aware of it at the time the complaint was filed?

"THE WITNESS: Just generally. But specifically, I didn't—I wasn't aware of the circumstances, no.

"MR. HERBERT: Your Honor, I think at this time I might indicate that the time the complaint was originally filed, induced infringement was not charged. It was charged after the depositions in Danville.

"THE COURT: All right.

"MR. FALLON: I think the record ought to be consulted before that statement is made.

"THE COURT: Well, I can consult the record. I have it here.

"MR. HERBERT: Q. Do you have any control over Mr. Hales' or W. M. Hales' action in their business as dealers or distributors?

"A. No, sir." (R. 356–359)

■ Applying the test suggested by plaintiff in its trial brief:

"But civil culpability need not stop with the dealer who does the final act of making, using or selling. The prohibition of the law, now codified in § 271(b), extends to those who induce that infringement. Of course inducement has connotations of active steps knowingly taken—knowingly at least in the sense of purposeful, intentional, as distinguished from accidental or inadvertent. But with that qualifying approach, the term is as broad as the range of actions by which one in fact causes, or urges, or encourages, or aids

another to infringe a patent." Fromberg, Inc. v. Thornhill, 315 F.2d 407, 411 (CA 5, 1963).

the Court finds no active steps knowingly taken by defendant for the purpose of causing, urging, encouraging or aiding another to infringe the Baer Patent. The fact that defendant is listed in the telephone directory as having, and the fact that it does have, a telephone in the Danville office of Hales and the fact that defendant puts out a price list showing that Hensley Equipment Company is located at Danville and ships out of Danville, in and of themselves do not and could not create an agency relationship. Defendant's relationship with W. H. Hales is that the Hales Company maintains an independent warehouse for defendant, for which he charges accepted warehousing fees. Defendant has never discussed with Hales how to sell Hensley points on new Esco adapters. In fact, the evidence discloses that Mr. Hensley, the defendant's President, never even knew that Hales was selling Esco adapters and Hensley points as a unit until someone had testified to it during the course of the proceedings and after the filing of the complaint in the present action. Moreover, defendant does not now have and has never had any control over Hales in their business as dealers or distributors. Under the foregoing circumstances there could be no inducement and hence no infringement of Claim 5 by defendant. There is, therefore, no further need to consider Claim 5 of the Baer Patent and this Court does not now pass upon the validity of this claim. The Court merely finds that the defendant has not infringed Claim 5 of the Baer Patent.

Turning to Claims 8 and 9 of the Baer Patent, in reply to plaintiff's complaint that these claims have been infringed, defendant, in addition to denying any infringement, alleges that the Baer Patent is invalid and void on the grounds (1) that the subject matter of the Baer Patent was old when Baer made his design, and in fact, was well known more than one year before Baer filed his patent application, and (2) that the Baer disclosure contained no more than a minor modification over other well known structure, which modification would have been obvious at the time invention was made to a person having ordinary skill in the art.

Defendant further alleges that plaintiff comes into Court with unclean hands, in that it has affixed, or caused to be affixed, to certain structures the number of the patent in suit, thereby falsely implying that those structures are patented.

The defendant, as appears above, has admitted that the first 109 points it manufactured infringe Claims 8 and 9 of the Baer Patent. The Court, after considering the exhibits, laboratory tests, testimony and all other evidence in the case, is satisfied that, if claims 8 and 9 of the Baer Patent are valid, the defendant's change in design and construction of its new points is insufficient to avoid its previously admitted infringement of these two claims. The first manufacture by defendant of Hensley-Esco type points is exemplified in Exhibit 12 and the subsequently changed manufacture by defendant of Hensley-Esco type points is exemplified in Exhibit 13. When questioned about the differences in the manufacture of these two items, Mr. Hensley testified as follows:

"THE COURT: And you are familiar with the differences in the manufacture of 12 and the manufacture of 13?

"THE WITNESS: I am, Your Honor.

"THE COURT: Would you tell us what those differences are?

"THE WITNESS: In Exhibit 12 the ears were somewhat square in shape and in Exhibit 13 they were more of an extended sharkfin without parallel sides.

"THE COURT: Other than the ears, is there any difference in those two manufactures?

"THE WITNESS: No, sir, not any difference whatsoever." (R. 174)

This difference in the ears (or tongues) consisted of a change in the shape of the tongue (ear) so as to yield a one-eighth of an inch spacing in the recesses of the adapter and an extension of the fins (designated "sharkfin" by the defendant) so as to make them coextensive with the changed tongues. In this fashion the horizontal dimension of the tongue was increased, while the vertical dimension was decreased. No tests or calculations were utilized, the change being merely Clyde C. Hensley's "intuition". While the sides of tongues on the smaller sized Hensley-Esco type points may or may not be said to be substantially parallel, the sides of the tongues on the larger, 7″, sized Hensley-Esco type points appear to be as close to substantially parallel as measurement could provide (R. 666, 667). Furthermore, Clyde C. Hensley did not deem angle of the sides of the tongue of any significance to him (R. 354). The above described change is at most a colorable change, and as such it cannot avoid infringement. While the "sharkfin" structure on the outside of the tongue sides of the Hensley-Esco point may have some value for the purpose of throwing or sweeping away aggregate in a digging operation, the subsequent change in the Hensley-Esco tongue with an extension of the shark fin so as to make it coextensive with the tongue merely resulted in a change in appearance (R. 174), and in no way aided the operation of the shark fin, which leads to the question, if, as Clyde C. Hensley testified on deposition (his deposition of October 4, 1961, p. 49), there was no reason for having the rearwardly extending tongues, why did he keep them when he made the change? The question is particularly important in the light of his statement that he "didn't want to infringe". The reasonable answer brought out in the laboratory tests of plaintiff's engineers, both eminently qualified, seems to be the stabilizing function of the rearwardly extending tongues. Both plaintiff and defendant offered laboratory tests to show the stabilizing effect of the tongues on the Baer and the Hensley-Esco

type points. Of the two tests, the Court finds the plaintiff's guillotine test (a dynamic test) to be by far the more reliable and as close to normal severe operations as a test could come. The Hensley tests, which were designed by an employee who has a PH.D. degree in Electricity and Metallurgy (R. 376), but who was not present at the trial, were run by Clyde C. Hensley, whose competence as an engineer does not approach that of Eyolfson and Graf, who ran plaintiff's tests. Furthermore, the Hensley tests, which were in the main made on smaller sized points (where the additional stabilization effect has lesser importance), were variable and impossible to evaluate. The Hensley tests failed to place the load (stress) on the tip of the tongue where it should properly have been placed, in order to emulate stress applications found in field operations, while in plaintiff's tests the load was placed on the tip of the point and generally transversely thereto, thereby simulating heaviest field loading. In fact, in the Hensley tests the load was moved further and further away from the tip of the point as the size of the point increased, and no effort was made to test the larger 7″ point. The plaintiff's tests showed that both Baer and Hensley-Esco type points operate in the same manner, i. e., the inwardly extending tongues provide a stabilizing function in addition to the wedge faces and thereby protect the pin from deformation and make the point removal simple. Clyde H. Hensley admitted that although the one-eighth of an inch spacing in the recesses of the adapter remains unchanged, the tongues become larger as the Hensley-Esco type points become larger (R. 178), and that stabilization becomes more important as size increases (R. 371). This may well account for defendant's attempt to avoid infringement by foregoing certain initial stages of stabilization in its smaller size points where added stabilization may not be needed as often. A somewhat less efficient operation does not avoid infringement. See Admiral Corp. v. Zenith Radio Corp., 296 F.2d 708, 717.

As an appendix hereto the Court has attached copies of plaintiff's Exhibits 23A and 24A, drawings showing the basic features of Claims 8 and 9 of the Baer Patent *as they are found in the Hensley-Esco type points.*

The Court is satisfied that the tongues on the Hensley-Esco type point serve the above indicated stabilization purpose and that this is the very reason they were retained. It follows from the foregoing that, if valid, Claims 8 and 9 of the Baer Patent have been infringed by the manufacture and sale of Hensley-Esco type points and the Court so finds. See Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 617, 70 S.Ct. 854, 94 L.Ed. 1097.

This now brings us to the basic issue before the Court: Are Claims 8 and 9 of the Baer Patent valid?

Of the fifteen patents on two-piece teeth brought to the attention of the Court by the defendant, only one came into commercial use prior to World War II, and this required time consuming burning or battering to remove the replaceable point (R. 296). The inventor of the excavating tooth of the patent in suit, Joseph Baer, was working on the problem of easily removable points on two-part teeth early in World War II and originated a construction wherein the locking means was not stressed during field operations (R. 197, 201). The Baer construction employed a wedge-shaped point fitting over the adapter nose, with a pin passing vertically through aligned openings in the point and nose. The pin was held in place by a rubber plug equipped with a steel insert. For drawings of the Baer Patent, see copies thereof, plaintiff's exhibit 2, included in the appendix hereto.

According to the patent, the nose of the adapter is wedge-shaped, having converging faces. The point has a rearwardly facing socket defined by similar wedge faces, so that the point can seat on the adapter nose. The upper portion of the point is relatively thick or heavy to constitute a spiked portion. Rearwardly of the point are provided integral tongues which fit into recesses provided on the adapter. The mating portions of the point and adapter are so arranged that the point can move rearwardly on the adapter as wear occurs on the seating bearing faces of the nose and socket. For this purpose spacing between the socket apex and nose is provided, as also is spacing between the rear ends of the recesses and the rearwardly extending tongues.

When the adapter has its rear or shank portion secured to the lip of a piece of excavating equipment, the tongues serve to stabilize the point against transverse stresses. This provides stabilization in addition to that provided by the wedge faces. In so doing, the tongues serve to protect the locking pin against deformation. Even under heavy stresses, the pin is merely used to oppose gravity to keep the point from falling off the adapter (R. 56, 102). Thus, there is no deforming stress applied to the pin which would make it difficult to remove when point replacement is necessary (R. 102).

The spike portion of the point is normally stressed at its tip, and the type of stress that would tend to deform the pin is a transverse stress, i. e., one at right angles to the length of the spike portion. These transverse forces can reach upwards of 10,000–20,000 foot pounds (R. 54). When transverse forces of this order are applied to the tip of the spike portion, the spike portion acts as a cantilever to transfer the stress to the rear of the point, using the adapter nose as a fulcrum (R. 155, 199). The operation under destructive stresses applied transversely to the spike portion, the point, while deflecting, moves forwardly slightly, so that the tongues come into bearing engagement with the walls of the adapter recesses. The tongues fit within the adapter recesses with substantially parallel side edges, with a sliding fit in order to accommodate wear on the edge bearing surfaces (R. 213). Deflections of the order of one and one-half inches are not uncommon at the spike portion tip, which are transmitted in lever fashion by means of the heavy spike portion to the tongues

so as to prevent deformation of the locking pins (R. 199).

These Baer-type excavating teeth enjoyed an immediate and widespread commercial success (R. 300). Licenses under the patent were taken out by such principal tooth manufacturers as American Steel Foundries, now Amsted Industries, the American Manganese Steel Company Division of American Brake Shoe Company, and Caterpillar Tractor Company (R. 215).

In its effort to overcome the presumption of validity that attaches to the Baer Patent and in support of its burden of proving invalidity, the defendant introduced in evidence fifteen patents on two-part teeth, but relied primarily upon the Mekeel Patent, copies of the drawings of which (defendant's Exhibit BB) are included in the appendix hereto. However, it would appear that teeth based upon the Mekeel Patent, the defendant's most pertinent overall reference against the Baer Patent, were never actually constructed and thus never put to any commercial use or test.

The basic difference in plaintiff's and defendant's treatment of Claims 8 and 9 lies in plaintiff's reliance on the principle that where the parts are old but coact to give a new result, patentable invention is present, Faulkner v. Gibbs, 338 U.S. 267, 268, 70 S.Ct. 25, 94 L.Ed. 62, while defendant contends that the various parts of the point function independently and there is no coaction, and hence, no patentable invention. Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S. 147, 71 S. Ct. 127, 95 L.Ed. 162. Furthermore, says the defendant, the teachings of the Baer Patent and the Mekeel Patent are identical, the entire structure of Baer being described in the earlier Mekeel Patent.

During argument on Motion for Summary Judgment, plaintiff urged three features as being the major distinctions between Baer and Mekeel structures as they relate to Claims 8 and 9, namely, (1) the reversal of the tongues and recesses (by putting the tongues on the point and the recesses in the adapter); (2) the heavier upper spike portion of the Baer point; and (3) spacing between the parts of the point and the adapter. The colloquy between the Court and counsel was as follows:

"THE COURT: You mean then, that you solved the problem of long standing by reversing the tongues?

"MR. FALLON: First.

"THE COURT: Beefing up the point?

"MR. FALLON: Second, yes, sir.

"THE COURT: By putting on a heavier spike top?

"MR. FALLON: Yes, sir.

"THE COURT: And by providing a non-closure between the two of them?

"MR. FALLON: Yes, Your Honor, three things."

In addition to the above, plaintiff urges as significant the fact that the Mekeel point was symmetrical (reversible) and that therefore the upper and lower edges of the tongues and recess could not both be parallel to each other and also to the upper wedge face of the adapter nose, and that there could be no stabilizing effect in the functional operation of the Mekeel tooth.

With relation to the three major and distinctive features relied upon by plaintiff in support of Claims 8 and 9, defendant contends that each feature is old and may be found in the prior art, as exemplified in various patents introduced in evidence through its witness, Dirks Foster. That each of these features, if considered separately, may be said to have been anticipated by the prior art, exemplified by patents offered in evidence seems clear, but the big and narrower question is, do these features operate independently of each other or are they so coactive as to bring a new and useful result. In answering this question, while it is true that Mr. Foster, a patent attorney, testified that these three features operate independently of each other, the fact remains that such testimony is argumentative in character and must be viewed with caution. Kohn

v. Eimer, 2 Cir., 265 F. 900, 902; Rogers v. Hensley, 194 Cal.App.2d 486, 492, 14 Cal.Rptr. 870. See also Ric-Wil Co. v. E. B. Kaiser Co., 7 Cir., 179 F.2d 401, 405, and Hughes Tool Co. v. Chicago Pneumatic Tool Co., D.C., 90 F.Supp. 845, 847. It does not overcome the testimony of plaintiff's engineers, Eyolfson and Wilcox, who testified that the tips of points under harsh stresses deflect as much as one and one-half inches, which, because of the *heavy beam sections,* is transmitted to the rear of the points, causing the *tongues* to come in engagement with the upper or lower surfaces of the recesses, depending upon the direction of impact and by providing a *greater spacing;* it is manifest that only the stronger transverse impact will result in the tongue contact. Eyolfson testified in part:

"THE WITNESS: That is the primary function of the tongue, to add to the stabilization. There is some stabilization accomplished by forces of friction, but in an impact blow, you don't have static friction, you get into moving friction, and it doesn't take too much for this wedge face bearing to get lost. And actually it applies to the tongues. *You see, if this moves forward just a very small amount, then any gap that's in here is very rapidly taken up. And besides that, this heavy portion here is not only there for wear but it's also to create a very strong beam.* So that when you do pivot about this, as a slight amount of separation takes place and you do pivot about this, then your tongues will come into contact as soon as possible. *It is sort of like an overload spring, Your Honor.* It doesn't work unless it's needed, but it is there whenever you get the heavy blow." (Emphasis added). (R. 53, 54).

Wilcox testified in part:

"A. The stress was applied right out here on the tip of the point.

"Q. And where, if any place, was that stress transmitted to?

"A. Well, the stress was transmitted along this upper spike portion here.

The upper portion of this tooth is quite a bit heavier than the lower box structure. This is what we call the spike portion.

"Q. I hand you now Plaintiff's Exhibit 2, and perhaps you can acquaint the Court with what you mean by spike section.

"A. You can see here, Your Honor, this top part, which is called the spike portion.

"Q. That's designated 43?

"A. 42.

"Q. 42?

"A. And 43, both, yes. 42 is the top surface, 43 I believe is the edge of this surface. It's quite a bit heavier. *And this is done purposely, because this is a sort of a cantilever out here. You get your greatest forces out on the tip, and we have to have this heavy cantilever section to transmit these forces back here where they are resisted."* (Emphasis added). (R. 198, 199).

This factual testimony from qualified engineers, to whose testimony the Court attaches more weight than to that of the patent attorney, leads the Court to the conclusion that while these three features may and could operate independently of each other, in fact, in the Baer Patent they are coactive and bring about a new and useful result, namely, added stabilization when destructive forces are applied transversely to the tip of the tongue, thereby protecting the pin against deformation. This gives the Esco (Baer) point the commercial advantage obtainable from a readily removable point. This combination is, therefore, both new and useful and solves an important problem in the heavy construction industry. It constitutes invention for Claims 8 and 9 of the Baer Patent unless it can be established that all three of these features are found in the Mekeel Patent or are obvious therefrom to one skilled in the particular art at the time the invention was made.

While it might be plausibly reasoned, as Mr. Foster did, that the tongues on

the adapter of the Mekeel Patent which fit into the recesses of the point are the equivalent of the tongues on the Baer point which fit into the recesses of the adapter, this is not a true equivalent because there is a difference in the strength and ability of the tongues to withstand force when the tongues are on the point rather than on the adapter. This was admitted by Mr. Foster when he said:

> "There is probably a difference between the tongues extending rearwardly from the point and extending forwardly from the adapter, but it is a matter of degree and I can't tell how much a degree." (R. 480).

Furthermore, if the recesses are on the point, as in Mekeel, it has a disadvantage "in that you have weakened the structure by notching it out here, and it is possible that stresses will build up in this notch which will weaken the point itself." (R. 288, 289). Another difference claimed by plaintiff and mentioned above and sustained by the evidence is the fact that the point in Mekeel was symmetrical (R. 545). Therefore, the upper and lower edge of the tongue and recess could not be substantially parallel to each other and also to the upper wedge face of the adapter nose.

Furthermore, even if it could be said that Mekeel teaches that the tongue can be on *either the point or the adapter,* the fact remains that Mekeel *does not provide the second coactive feature of Baer, the heavy upper spike portion of the point.* The fact that the Mekeel point is symmetrical and hence reversible is not the equivalent of a heavy upper spike portion. The upper and lower faces (if there is a true upper and lower face to a reversible point) and the sides of the Mekeel point appear to be of the same thickness. Mekeel can't give the same heavy cantilever action provided by the spiked portion of the Baer point. Hence, neither this feature nor an equivalent thereof appear in Mekeel. The fact that a heavy upper spiked portion of the tooth appeared in other prior patents which did not provide the other coactive elements of Baer does not void the Baer patent. The absence of this spiked portion of the Baer Patent alone is sufficient to defeat defendant's claim that Mekeel anticipated Baer.

The third feature of Baer, the spacing between the point and the adapter, is not provided in Mekeel. The specifications of Mekeel when applied to figures 8 and 9 of the Mekeel Patent (see appendix) show:

> "In this case, 14$^a$ indicates the tenon formed on the nose 16$^a$ of the base 12$^a$. 18$^a$ indicates the shoulder on the nose, which is *adapted for engagement* with the base of the point 13$^a$ when the points are assembled." (Lines 69–73 of page 2, Mekeel Patent No. 1,845,677, Italics added.)

If the other features of Baer were present in Mekeel, this specification might not be too important in view of the testimony of plaintiff's expert that spacing would arise from usual manufacturing tolerances.

While the Mekeel Patent was never utilized, and no known manufacture resulted from which its effectiveness could be evaluated, there is serious doubt that a functional operation of Mekeel would provide the desired stabilizing effect. Mr. Eyolfson testified:

> "THE COURT: In other words you tell me there is no stabilizing effect there.

> "THE WITNESS: That's right, and what's even more important is that once that thing moves forward in any degree, it could not return because the thing would seize tremendously * * " (R. 630)

The basic teaching of Mekeel is entirely different from that of Baer. Mekeel does not rely on tongues for additional stabilization, since a rigid lock is brought about by the expanded tenon which provides the connection between the point and the adapter. This Mekeel contribution is carefully specified in each of the Mekeel claims.

■■ Defendant has failed to prove that what Baer did was *not new.* De-

fendant has also failed to prove that the differences between claims 8 and 9 of Baer and the prior art as a whole would have been obvious at the time invention was made to a person having ordinary skill in the art to which the subject matter of these claims pertains. The Court finds that while the pertinent separate features of each of claims 8 and 9 have appeared separately in prior patents, the Court further finds that each such prior art patent has *less than the full combination of elements specified in either Claims 8 or 9*. Furthermore, none of the prior art patents teach a replaceable point where the heavy spike section transmits impact forces to rearwardly extending tongues during the deformation of the entire tooth, this teeter-totter like transmission being made possible by the spacing of the point and adapter. The Court finds that the combination of the elements found in each of Claims 8 and 9 result is something new, a new coaction between elements, which would not have been obvious to one skilled in the particular art at the time invention was made. See Radiator Specialty Co. v. Micek, 9 Cir., 327 F.2d 554, 555; Bates v. Coe, 98 U.S. 31, 49, 25 L.Ed. 68. The failure of the art to adopt an allegedly anticipating structure is a significant indication of the novelty of Baer when he came up with a satisfactory two-part tooth that met with immediate and wide commercial success. See Artmoore Co. v. Dayless Mfg. Co., 7 Cir., 208 F.2d 1, 4; also Washburn & Moen Mfg. Co. v. Beat-em-All Barbed Wire Co., 143 U.S. 275, 282, 283, 12 S.Ct. 443, 36 L.Ed. 154.

 The Court finds no misuse of Esco Model No. R. 3 (the smallest assembly of point and adapter). Esco and its licensees manufacture a number of varieties of 3″ size points. These points lack the previously referred to rearwardly-extending tongues. The 3″ style teeth are made up of the adapter, point, pin and plug. Both the points and the adapters are marked with the patent number in suit. The Court finds that this is justified, notwithstanding the absence of the rearwardly-extending tongues, since a substantially longer locking pin is used in combination with a pin-receiving recess in the point to constitute additional stabilizing means as called for under Claim 5 of the patent in suit. As the witness Wilcox testified, "the additional stabilizing means would be the fact that the pin goes all the way through the bottom, the box section here, so as to hold it on more firmly." (R. 229). In making this finding the Court is still not thereby passing upon the validity of Claim 5, since the presumption of validity alone is sufficient against a misuse defense of the character presented in this case where the misuse relates exclusively to the markings of the numbers of the patent upon the manufactured pieces. Furthermore, these markings were placed on the two pieces on advice of plaintiff's patent attorney (R. 284, 285). Under such circumstances, it cannot be said that the defendant comes into court with unclean hands.

Based upon the record before it, the Court finds nothing in the conduct of the parties to justify an award of punitive damages or attorneys' fees to either party, and the same is, therefore, denied to each.

Before concluding, the Court observes that it attaches no particular weight to the teeth offered in evidence by defendant from the so-called Pleasanton operation, since there is no clear indication of the stress forces applied in that operation, and such evidence as was presented might reasonably cause one to conclude that it was a light-duty operation, a re-handling of material, as contrasted to a normal construction project.

Finally, the Court finds that the evidence does not sustain defendant's defense of file wrapper estoppel.

Based upon the foregoing, it is accordingly ordered that judgment be entered in favor of plaintiff as to validity and infringement of Claims 8 and 9 of the Baer Patent and against plaintiff as to its claim that defendant infringed

Claim 5 of said Patent by inducement. Plaintiff shall prepare findings of fact, conclusions of law and judgment consistent with this opinion.

APPENDIX

No. 39806, 23 A:
Plff. Exhibit No.
Filed OCT 16 1964
James P. Welsh, Clerk
By _____ Deputy Clerk

CLAIM 8

An excavating tooth point adapted to receive the wedge-shaped nose of an adapter having upper and lower faces diverging from a substantially rounded front end portion, substantially parallel side faces,

and an enlarged rear shank portion in which recesses extend from the side faces longitudinally of the nose and have substantially parallel side edges which are substantially parallel to one of sais diverging faces and disposed between the planes of the diverging faces, and comprising, in combination,

a spike portion of relatively heavy section,

a housing portion having side walls and an integral web forming with the spike portion

a wedge-shaped socket having an open end at one end of the spike portion, said wedge-shaped socket being of a depth and shape normally and firmly to receive the wedge-shaped nose of the adapter with the space between the nose and adapter at the vertex of socket and with said spike and housing portions substantially spaced from the shank portion of the adapter, and

said side walls of the housing portion having integral projecting tongues thereon adjacent the open end of the socket, and said tongues having substantially parallel side edges adapted to fit into said recesses of the adapter shank portion when the nose is seated in the socket, thereby to support the tooth on the adapter in directions transverse to the wedge faces.

ADAPTER SHANK

Recess

Nose

No. 37806
Plft Exhibit No. 24 A 1st
Filed OCT 16 1964
James P. Welsh, Clerk
By: *[signature]*
Deputy Clerk.

## CLAIM 9

In an excavating tooth, a removable tooth point adapted to maintain firm seating engagement on an adapter having a nose with rearwardly diverging wedge faces and an enlarged shank portion in which recesses provide substantially parallel edges in parallel relationship to one of the wedge faces and displaced laterally and rearwardly of the wedge faces, and comprising, in combination,

integral spike and housing portions together forming a wedge-shaped socket having wedge faces of an angularity substantially equal to that of the diverging adapter wedge faces and lengths such that the adapter nose is normally spaced from the socket vertex,

said housing portion having opposed and integral side tongues thereon displaced laterally of the socket wedge faces and projecting rearwardly from the housing portion, said tongues having substantially parallel edges in parallel relationship to one of the socket wedge faces and adapted to fit between the parallel edges of said recesses to provide support for the tooth point in addition to the wedge faces, and said tongues being normally too short to reach the ends of said recesses so as to prevent their interference with the seating of the wedge faces.

No. 39806

Exhibit No. 2

Filed OCT 6 - 1964

James P. Welsh, Clerk

By _____
Deputy Clerk

Sept. 27, 1949. J. BAER **2,483,032**

EXCAVATING TOOTH

Filed June 6, 1945 2 Sheets-Sheet 1

*Fig.1*

*Fig.2*

*Fig.3* *Fig.4*

*Fig.5*

*Inventor:*
*Josef Baer*

*By: McCulek, Wendt & Dickinson*
*Attys.*

Sept. 27, 1949. · J. BAER 2,483,032

EXCAVATING TOOTH

Filed June 6, 1945 2 Sheets-Sheet 2

Inventor
Josef Baer
By McCaleb, Wendt & Dickinson
Attys.

878

No. 39806

Exhibit No. *B·B*

Filed OCT 6 - 1964

James P. Welsh, Clerk

By _____
Deputy Clerk

BB

**Feb. 16, 1932.** VAN CORTRIGHT MEKEEL **1,845,677**

DIGGING TOOTH

Filed March 9, 1929 2 Sheets-Sheet 1

Witness:

Inventor
Van Cortright Mekeel,
Clarence E. Mehlhope Attys.

**Feb. 16, 1932.** VAN CORTRIGHT MEKEEL **1,845,677**

DIGGING TOOTH

Filed March 9, 1929 2 Sheets-Sheet 2

Fig.11

Fig.7

Fig.8

Fig.9

Fig.10

Witness:

Inventor,
Van Cortright Mekeel,
Clarence E. Mellhose
Attys.