Harry **FREDMAN**, Plaintiff,

v.

**HARRIS–HUB COMPANY, Inc.,**
Defendant.

Harry **FREDMAN**, Plaintiff,

v.

**ESTEE SLEEP SHOPS, INC.,** Defendant.

Nos. 64 C 978, 66 C 928.

United States District Court,
N. D. Illinois, E. D.

Oct. 6, 1969.

James P. Economos and George W. Alexander, Chicago, Ill., and Harvey B. Jacobson, Washington, D. C., for plaintiff.

Howard Goldsmith and Charles W. Ryan, of Dressler, Goldsmith, Clement, Gordon & Ladd, Chicago, Ill., for defendants.

LYNCH, District Judge.

## FINDINGS OF FACT

1. Plaintiff, Harry Fredman, is a United States citizen and a resident of Illinois. Defendants Harris-Hub Company, Inc., and Estee Sleep Shops, Inc., are both corporations duly organized and existing under the laws of the State of Illinois.

2. This litigation involves two actions filed by Harry Fredman for infringement of United States Letters Patent No. 3,118,151 issued on January 21, 1964 to Plaintiff in connection with his invention in a bed construction. Since that date Fredman has been and still is the owner of the Fredman patent.

3. These two actions were consolidated for trial by the Court at an April 19, 1968 pre-trial conference because they were brought by the same Plaintiff and include identical questions of fact and common legal principles.

4. Glideaway Bed Carriage Manufacturing Co., a division of Fredman Brothers Furniture Company, Inc., manufactures bed rails purportedly conforming to the rails described in the patent in suit under a royalty free license from Plaintiff.

5. Defendant Harris-Hub manufactures and sells assemblies or components designated as "slatless bed rails" to customers who assemble the components with a pair of end boards and spring assembly. One such customer is Defendant Estee which operates retail furniture outlets. Estee buys Harris-Hub bed rail assemblies and sells them as part of a complete bed unit with headboard, footboard and spring assembly. It is this bed construction and the incorporated Harris-Hub bed rail assemblies of the type of Plaintiff's Exhibits 95, 104, and 126 which are charged to infringe the Fredman patent.

6. This Court has jurisdiction over the subject matter of this suit and of the parties.

7. The Court granted Defendant's motion for dismissal at the conclusion of trial, having reserved ruling on three such motions made during the course of trial. The findings herein are based on all the evidence introduced at the trial.

8. The patent in suit is entitled "One-Piece Belt-Type Bedding Carrier" (PX. 1). In it the alleged invention is described as providing an arrangement in which one-piece metallic bed rails with an interconnecting belt or strap locks the bedding, securely retaining the spring frame on the bed rails and rigidifying the bed to provide a single interlocked assembly (Col. 1, Lines 9–19). The belt or strap is referred to in the claim as a "tension" member, but throughout the trial it was called a "cross-member"; for convenience the term cross-member will be used in these findings.

9. The patent in suit states that a primary object of the invention (Col. 2, Lines 7–36) is to provide a one-piece bed rail with resilient end portions and a cross-member interconnecting the central portions of the rails. As will be seen below with regard to claims 3 and 4 charged to infringe, the cross-member functions to "prevent outward deflection" of the rails, and claim 4 recites that the resilient end portions deflect laterally so that the "spring assembly is locked to the rails to rigidify the entire assembly by retaining the vertical flang-

es snugly to the spring assembly throughout the major portion of the length of the rails."

10. The one-piece bed rails of the patent in suit have a right angular construction with the bottom or horizontal flange thereof flared downwardly at each end into a plate-like end portion so that each bed rail is capable of resiliently flexing laterally at the plate-like end portion (Col. 2, Lines 21–32).

11. The rail end portions of the patent in suit must be flexible to such an extent that the right angular cross-sectional configuration of the rails, which will not flex (Col. 3, Line 70), will be retained in parallel relation along the major portion of the length of the rails (Col. 3, Lines 68–72; Col. 4, Lines 9–14).

12. Flexing of the plate-like end portions of the bed rails of the patent in suit may be as much as one inch (Col. 4, Lines 5–6). With this manner and degree of flexing at the end portions, the horizontal flange of the rail of the patent in suit constantly supports the spring assembly throughout the length thereof (Col. 4, Lines 27–30), and the vertical flanges of the side rails are held snug against the bedding (Col. 4, Lines 48–52).

13. The cross-member of the patent in suit is of a predetermined length (Col. 3, Line 66). From the remainder of the specification of the patent in suit (especially Col. 4, Lines 4–5) it is evident that this predetermined length should be such that the distance between the vertical flanges of the two side rails is equal to the width of the bedding with which the cross-member is to be used (Col. 4, Lines 23–4).

14. The patent in suit states that the cross-member "will absolutely preclude any outward lateral deflection of the bed rail" (Col. 4, Lines 25–6).

15. Defendants are charged with infringement of only claims 3 and 4 of the patent in suit. These claims read as follows:

3. A bed assembly comprising a pair of side rails, a pair of end boards interconnecting and extending perpendicularly to said rails, a spring assembly supported on and between said rails and between said end boards, each of said rails being of one-piece metallic construction and having a right angular cross-sectional configuration substantially over a major portion of its length and including a horizontal flange extending under the spring assembly, a tension member interconnecting the central portions of the rails thereby preventing outward deflection of the central portions of the rails and maintaining the horizontal flange thereof in underlying relation to the spring assembly thereby providing support therefor.

4. The structure as defined in claim 3 wherein each end portion of each rail is formed in the configuration of a vertical plate capable of being resiliently laterally deflected, hook members on the ends of each rail for engagement with the end boards, said plates enabling the end portions of the rails to be deflected laterally to engage with pins on the end boards spaced at varying distances apart for connecting the rails to the end boards while maintaining the central portions thereof in constant spatial relation, the spatial relation between the vertical flanges of the side rails being such that the spring assembly will be clamped there between whereby the spring assembly is locked to the rails to rigidify the entire assembly by retaining the vertical flanges snugly to the spring assembly throughout the major portion of the length of the rails.

16. The alleged inventive feature of claim 3 is the cross-member which prevents outward deflection of the rails and maintains the horizontal flange thereof under the spring assembly thereby providing support therefor. The alleged inventive feature of claim 4 is the end portions which are capable of being laterally deflected so that the vertical

flanges of the rails may be retained snugly to the spring assembly throughout the major portion of the length of the rails; the language appearing at the end of claim 4 ("by retaining the vertical flanges snugly to the spring assembly throughout the major portion of the length of the rails") was added by amendment to Claim 4.

17. Plaintiff's testimony further indicates that the invention of plaintiff's patent is embodied in the pre-set cross member and the flexing end pieces.

18. Defendants relied on Fanders U. S. Patent No. 1,296,437 (DX. 11), dated September 12, 1933. Fanders discloses a cross-member connecting angle iron bed rail as an anti-spread device.

19. Defendants also relied on Ressler U.S. Patent No. 2,666,932 dated January 26, 1954. The Ressler patent discloses a slatless bed assembly with a cross-member interconnecting the side rails and which functions as an anti-spread device.

20. Neither Fanders nor Ressler were cited during the prosecution of the patent in suit in the Patent Office; the Patent Office Examiner's search notes reveal that the Examiner did not search in the class and sub class in which the Fanders patent is classified.

21. Defendants also cited two other prior art references, Spiegel U.S. Patent No. 1,274,802, dated August 6, 1918, which shows an end member similar to the end member of the Harris-Hub accused structure illustrated by DX. 8 and Dyke U.S. Patent No. 1,424,204, dated August 1, 1922 (DX. 14), which has an end member of the type that is used on the Harris-Hub accused structure shown by DX. 9.

22. Defendant Harris-Hub began manufacture of its accused bed rail assemblies in August 1963. That structure and three later modifications thereof have been charged as infringements of the patent in suit.

23. The same rails that are accused of infringing the patent in suit are also sold by Harris-Hub without the cross-member. Also, the accused structures with the cross-member are sometimes used with slats.

24. The Harris-Hub accused rail assemblies differ from each other in the construction of the end members on the rails; the original Harris-Hub rail has a two-piece end member (PX. 36; DX. 16 —top figure), two other types of rail have one-piece end members (DX. 8 and 9; DX. 16—middle and lower figures); and the fourth type of rail has a two-piece end member with an adjustable hook (PX. 126).

25. All four structures described in Finding 24 above were charged to be infringements of claim 3 of the patent in suit.

26. All but the fourth structure described in Finding 24 were originally charged as infringements of claim 4 of the patent in suit. However, plaintiff, during his examination as an adverse witness, testified that the end plates on the original Harris-Hub rail, which is no longer in production, do not flex. Thereafter, plaintiff's charges of infringement of claim 4 were limited to two modifications of the original Harris-Hub rail.

27. All of the four structures of Finding 24 were sold by Harris-Hub with a cross-member. The first cross-member used by Harris-Hub was a two-piece, pre-set wire member, but, subsequently, Harris-Hub employed a cross-member made of two pieces having a number of holes in one piece so it could be adjusted.

28. The Harris-Hub bed rails charged to infringe are of right angular metallic construction including a horizontal flange and a vertical flange with a cross-member interconnecting the central portion of the rails to keep the rails from spreading; these Harris-Hub rails are essentially identical in structure and function to the prior art Fanders patent. Similarly, the prior art Ressler patent shows a structure for supporting a bed spring without the use of slats which has the equivalent of a horizontal flange and a vertical flange on the side rails of a

bed with the side rails being joined by a cross-member to keep the rails from spreading.

29. Bed rails having a two-piece end member as shown in PX. 36 were said by the patentee to be about forty years old. Harris-Hub bed rails having one-piece end members as exemplified by DX. 8 and DX. 9 correspond to those shown in the prior art patents, Spiegel, (DX. 13) and Dyke (DX. 14), respectively, and function in the same manner as do the structures of the Spiegel and Dyke patents. Harris-Hub bed rails having an adjustable hook portion as exemplified by PX. 126 were sold by Harris-Hub many years before the patent in suit.

30. The Harris-Hub bed rails here charged to infringe correspond in structure and in function to the bed rails of the prior art which antedates the alleged invention of the patent in suit.

31. The prior art Fanders patent discloses an anti-spread device for beds comprising a pair of side rails which can be made of angle steel of right angular cross-sectional configuration including a horizontal flange adapted to extend under a spring assembly and a cross-member interconnecting the central portions of the rails to prevent outward deflection of the central portion of the rails so that the horizontal flange may be maintained in underlying relation to the spring assembly to provide support for the spring assembly. Insofar as such rails being made of "one-piece" construction, plaintiff asserted that one-piece rails are equivalent to prior art rails made of more than one piece; the fact that Fanders does not illustrate end boards or a spring is immaterial because the patent in suit states that the headboard, footboard and spring are of conventional construction, and all beds employing bed rails have end boards and a spring assembly.

32. The prior art Ressler patent discloses a structure for eliminating the use of slats in a bed which supports a spring construction on the equivalent of a horizontal flange of the side rails of a bed and which has the equivalent of a vertical flange on such side rails; the side rails of the Ressler patent are joined by a cross-member "tensioning" the side rails to keep the side rails from spreading and to maintain them in even balanced position to prevent accidental displacement of the spring.

33. The Fanders patent and the Ressler patent each disclose the alleged inventive feature of claim 3, namely, the cross-member which prevents outward deflection of the rails.

34. In seeking to distinguish patentee's structure from the teaching of the Fanders patent, plaintiff asserted that the Fanders patent was intended to be used with slats. This assertion is without merit because neither claim 3 nor the other patent claims limit the alleged invention to a structure which avoids the use of slats, (see patent claims); the patentee admitted that his own "Glideaway" structure, said to be made under the patent, was used with slats, the Fanders patent as issued makes no reference to slats, and the Fanders patent must, of course, be considered only for what it shows on its face and hence what it teaches a person skilled in the art. Furthermore, plaintiff's assertion ignores the fact that slatless bed rails were stated by the patent in suit to be old in the art and the fact that the prior art Ressler patent shows and describes a slatless bed rail construction employing a cross-member (DX. 12).

35. Plaintiff also sought to distinguish the alleged invention of claim 3 by asserting that the cross-members of the prior art were not designed to pull in the side rails but merely functioned as bed braces to prevent the rails from deflecting outwardly; this alleged distinction is without merit because claim 3 (and also dependent claim 4) is not limited to a cross-member that draws in the side rails but, on the contrary, states that the cross-member is connected to the rails "thereby preventing outward deflection."

36. The alleged invention set forth in claim 3 of the patent in suit is lacking in novelty over either the prior art patent to Fanders or the prior art patent to Ressler or both, and would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains in view of either the prior art patent to Fanders or the prior art patent to Ressler, or both.

37. Claim 3 of the patent in suit is invalid.

38. Claim 4 of the patent in suit is a dependent claim which contains all of the limitations of Claim 3 plus two additional requirements upon which the alleged invention of Claim 4 is predicated. The first of these requirements refers to the formation of the "end portion" of each rail into a vertical plate which is "capable of being resiliently laterally deflected." The second of these requirements contains a limitation which relates to the manner in which the rails are maintained in parallel relationship with one another so that the "spring assembly is locked to the rails to rigidify the entire assembly by retaining the vertical flanges snugly to the spring assembly throughout the major portion of the length of the rails."

39. The Harris-Hub bed rail assemblies exemplified by DX. 8 and DX. 9 are the only structures charged by plaintiff to infringe claim 4 (see Findings 22–26). Claim 4 is not infringed if the end portions of the accused rails do not flex, i. e., if such end portions are not "capable of being resiliently laterally deflected" as recited in Claim 4.

40. The Court finds that the words "flexibility" or "rigidity" are relative terms, particularly since virtually anything will flex if enough pressure is applied to it. The Court finds that the Harris-Hub rails do not meet the first requirement of Claim 4 in that such rails are not designed to flex at their end portions and are not capable of being resiliently laterally deflected.

41. Both the patent and testimony introduced by plaintiff make it clear that the lateral deflection or flexing action required by Claim 4 takes place primarily at the end portions or "at the four corners": that portion of the rails of the patent in suit having right angular cross sectional configuration will not flex and the major portion of the length of the rails will be maintained in parallel relationship. In contrast to the lateral deflection of the patent in suit which takes place primarily at the four corners, the Harris-Hub rails charged to infringe Claim 4 bow along their entire length and do not function in the manner specified in the patent in suit.

42. The lateral deflection referred to in Claim 4 is not insignificant in amount; the patent teaches that when each side rail is moved inwardly one inch the end portions of each rail are laterally deflected as much as one inch. The patent states:

"Normally, the spring assembly is 52½ inches wide and the end portions of the bed rails may be deflected as much as one inch thus accommodating headboards having variations of two inches more or less than the standard width of the spring assemblies."

In contrast, the accused Harris-Hub rails are not capable of such lateral deflection at their end portions; an expert witness for the plaintiff testified that the Harris-Hub rails did not and could not deflect as much as one inch or even one-half inch when the center of the rail is moved inwardly and actual measurements made by this witness on a Harris-Hub rail in a test rig he had devised showed that when the central portion of the rail was deflected one inch, lateral deflection measured at points ¼ inch, ¾ inch and 2½ inches from the end of the rail was 248/10,000 inch, 502/10,000 inch and 1022/10,000 inch. Plaintiff's witness pointed out that said degree of deflection is significant for the type of end piece on the accused rail. However, the plaintiff's end pieces are designed to accommodate almost the entire amount of flex and therefore flex to

a much greater degree than standard end pieces.

43. The Court finds, after considering the testimony and courtroom demonstrations, that the Harris-Hub rails do not meet the second requirement of Claim 4 referred to in Finding 38 in that such rails when placed in a bed assembly having a spring do not "retain the vertical flanges snugly to the spring assembly throughout the major portion of the length of the rails."

44. The patent states in both its specification and claims that the "major portion" of the length of the rails is the entire rail except for the plate-like end portion. In contrast to the requirement of Claim 4 that the vertical flanges of the side rails fit snugly to the spring assembly throughout the major portion of the length of the rails, inasmuch as the accused Harris-Hub rail structures have a continuous bow throughout their entire length, and do not flex solely at the end portions as required by the patent in suit, the vertical flange of the Harris-Hub rails fits against the spring along only a small portion of the total length of the rails at the centers thereof. The aforementioned bowing of the Harris-Hub rails was observed by the Court during courtroom demonstrations and reflected in the testimony, but was also shown by measurements taken during cross-examination of one of plaintiff's witnesses wherein Harris-Hub rails inserted in the end boards of a bed having slots 54½ inches apart showed the distances between the rails to be 54⁹⁄₁₆ inches at the ends, 53¼ inch half way between the center and the end of the rails, and 52⅝ inches at the center.

45. Plaintiff's expert witness, Mr. Benjamin, made a courtroom demonstration in an attempt to show that the end portions of the accused Harris-Hub rails were capable of flexing. Mr. Benjamin admitted that the Harris-Hub rails could not flex in the manner of the patent in suit and further testified that the amount of deflection which he measured was, while significant for that type of rail, quite different from what is stated in the patent in suit. Mr. Benjamin testified that he used a test rig rather than a bed because it was too difficult to control the many movements of a rail in a bed; he admitted that the measurements he made in his test rig included extraneous movements other than the lateral deflection being measured.

46. Plaintiff maintained that the Harris-Hub rail as exemplified by PX. 36, was not an infringement of Claim 4 of the patent in suit and that Harris-Hub rails as exemplified by DX. 8 and DX. 9 were infringements of the patent in suit, but the evidence established that the PX. 36 rails function in the same manner as do the DX. 8 and DX. 9 rails.

47. None of the Harris-Hub bed rail assemblies charged to infringe Claim 4 of the patent in suit have end portions that are capable of being resiliently laterally deflected in the manner required by Claim 4. None of the Harris-Hub bed rail assemblies charged to infringe Claim 4 of the patent in suit serve to rigidify the bed assembly by retaining the vertical flanges snugly to the spring assembly throughout the major portion of the length of the rails as required by Claim 4. None of the Harris-Hub bed rails charged to infringe Claim 4 of the patent in suit are made of "one-piece" metallic construction as required by Claim 4.

48. Claim 4 of the patent in suit is not infringed by any structure made, used or sold by either of the defendants herein.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties to this action and the subject matter of the suit.

2. Any conclusion of law herein that is factual in nature or contains assertions of fact shall, to the extent proper, be deemed a finding of fact.

3. The Fanders U.S. Patent No. 1,926,437, which is the prior art reference most pertinent to Claim 3, herein, was apparently not before the Patent Office when it was examining the patent

application which was to become the patent in suit. It is further unclear as to whether the Ressler U.S. Patent No. 2,666,932 was considered. Consequently, the statutory presumption of validity attaching to the issuance of a patent is of no aid to the plaintiff.

4. Commercial success cannot create patent-ability in the absence of invention.

5. A patentee is presumed to know the prior art.

6. All of the elements of Claim 3 of the patent in suit, except for the requirement of the rails being of one-piece metallic construction, which the plaintiff himself has asserted is the equivalent of the prior art rails made of more than one piece, and the end boards and spring assembly, which the patent in suit states are the conventional construction, are found in Fanders U.S. Patent No. 1,926,437 and Ressler U.S. Patent No. 2,666,932. Claim 3 of the patent in suit is therefore invalid.

All of the elements of a claim being anticipated by a prior art reference, the claim is invalid.

7. A device which claims the same physical elements as a previously known device is unpatentable, even though an element of it may have been used in a different manner, and a claim of a patent for such a device is therefore invalid.

8. It would have been obvious at the time the alleged invention was made to a person having ordinary skill in the art to which the subject matter pertains to use the cross-member of the Fanders U.S. Patent No. 1,926,437 or the Ressler U.S. Patent No. 2,666,932, in the manner that the cross-member of the patent in suit is allegedly used and therefore Claim 3 of the Fredman patent is invalid.

It is not inventive to make obvious use of a prior art structure.

9. An invalid claim cannot be infringed. Since Claim 3 of the patent in suit is invalid it is not directly or contributorily infringed by defendant Har-ris-Hub Co., Inc. nor is it directly infringed by defendant Estee Sleep Shops, Inc.

10. Claim 4 of the patent in suit is not infringed by any structure made, used or sold by either of the defendants herein because the defendants' structures are different from that recited in Claim 4 of the patent in suit and defendants' structures do not contain elements referred to in said claim.

The claim of a patent is not infringed when the accused device differs in structure or function from that recited in a patent claim or where the accused device omits one or more elements and its function recited in such patent claim.