NOMA LITES CANADA LIMITED,
Plaintiff,

v.

WESTINGHOUSE ELECTRIC CORP.,
et al., Defendants.

Civ. A. No. 2413–70.

United States District Court,
District of Columbia.

July 7, 1975.

Francis C. Browne, Washington, D. C., for plaintiff.

John F. Flannery, Julius Tabin, Chicago, Ill., Farrell R. Werbow, Arlington, Va., for defendants.

HART, Chief Judge.

### FINDINGS OF FACT

*Nature Of The Litigation And The Parties Thereto*

1. This is a suit for patent infringement under 35 U.S.C. §§ 271, 281, with jurisdiction and venue pursuant to 28 U.S.C. §§ 1338(a) and 1400(b), respectively. Plaintiff also filed a counterclaim alleging a pendent claim for unfair competition under 28 U.S.C. § 1338(b).

2. Plaintiff, Noma Lites Canada Limited (Noma), is the owner of U.S. Letters Patent No. 3,395,244 ('244), which issued July 30, 1968, for a combination electric cord and strain relief device. Rudolph Koehler was designated the inventor of the patented combination.

3. The complaint generally alleges that defendants infringe the Koehler, '244 patent, and specifically, the plaintiff urges that Claims 1, 3, 4, 5 and 6 of the patent are infringed.

4. Defendant Belden Corporation is the manufacturer of the allegedly infringing devices which, in turn, have been incorporated into various consumer appliances made by defendant Westinghouse and then sold through assorted retail outlets including defendants, The Hecht Company and Valentine's Appliance Store. The Hecht Company is owned by the remaining defendant, The May Department Stores Company.

Defendants have denied validity and infringement of the asserted claims of the patent in suit.

*The Patent in Suit*

5. In electrical appliances, especially those designed for hand-held uses, such as domestic flat-irons, electric drills or electric hand mixers, the electrical conducting cord which usually extends from

the appliance to a wall outlet is often subject to sharp bending or flexing at or near the point where the cord is attached to the appliance. Repeated flexing at this point causes fraying and wear and substantially reduces the life of the electric cord.

6. The appliance industry has long been aware of this problem, and since at least 1957, various strain relief devices have been used to minimize the strain on electric cords at the mechanical connection between the cord and the appliance.

7. The plaintiff's patent is for such a strain relief device in combination with an electric cord. Briefly, the plaintiff's patent describes a molded strain relief device which includes a tapered resilient sleeve having a wider end affixable to the appliance and a narrower "free" end displaced from the appliance. The electric cord extends axially through the sleeve which is molded about it. The sleeve is comprised of a series of spaced washer-like elements which circumscribe the cord and are movable as the cord is moved or flexed. In one embodiment, interconnecting pieces are secured to and between adjacent washer-like elements. In a second embodiment, the sleeve is formed of a series of interconnected spirals, which the Koehler patent states are washer-like elements.

8. Plaintiff specifically alleges that Claims 1, 3, 4, 5 and 6 are infringed by the defendants' strain relief device. Those claims are set out here as follows:

"1. The combination of an electric cord and a strain relief therefor comprising:

a series of washers assembled on said cord in closely spaced co-axial relation, said assembled washers together forming a sleeve disposed about said cord;

each said washer including a central aperture, said aperture of each washer in said series being tightly engaged upon said cord whereby each said washer constitutes a radial flange of said cord movable by and with it;

resilient interconnecting means between adjacent washers located radially outwardly of said cord for transmitting and distributing local stresses throughout the length of said sleeve upon flexing of said cord;

the radial widths of said washer flanges decreasing from one end of the sleeve to the other and each washer flange being deformable out of its radial plane upon said flexing of said cord;

the washer flanges of relatively small radial width being more resistant to such deformation than the washer flanges of relatively greater radial width."

"3. A strain relief as set forth in Claim 1; wherein said interconnecting means comprises a plurality of narrow, circumferentially spaced, links interconnecting each said washer to each of its neighboring washings; said washers being formed of thin resilient material rendering them resiliently deformable between said links in response to stresses inclining said washers to each other."

"4. A strain relief as set forth in Claim 1 wherein:

said washers are formed of thin resilient material rendering them resilient deformable between their interconnections in response to stresses inclining said washers relative to each other."

"5. A strain relief as set forth in Claim 4 wherein:

said washers vary progressively in breadth from one end of the sleeve to the other producing tapering of said sleeve from a relatively broad end composed of wider washers to a narrow end composed of narrower washers;

the washers at the narrow end of the sleeve being more resistant to deformation between their interconnec-

tions than those at the broad end with a corresponding graduation in the flexibility of the sleeve."

"6. A strain relief as set forth in Claim 4, wherein the interconnecting means is constituted by a plurality of narrow, radially spaced links."

9. The file history of the Koehler patent '244 shows that it was issued on an application filed March 14, 1967, which was, in turn, a continuation-in-part of a parent application filed on February 1, 1965 and subsequently abandoned.

10. Pertinent parts of the file history of these applications disclose some important facts for consideration in this lawsuit. In the parent application, Serial No. 429,280, Koehler's invention was set forth and it was noted in the specification as originally filed that

"It is moreover desirable that the strain relief should be relatively stiff adjacent to the appliance and relatively flexible remote therefrom, the increase in flexibility being gradual to avoid the creation of well-defined angles in the strain relief about which the cord may be bent."

In an amendment filed before action by the Examiner the description was reversed to say that the strain relief sought to be patented was more flexible at the end adjacent the appliance than at the free end of the sleeve.

After final rejection of the "parent" application by the Examiner, an appeal to the Board of Appeals was filed. While the appeal was pending, a continuation-in-part application, which resulted in issuance of the present patent, was filed. Thereafter, the appeal was dismissed and the "parent" application was abandoned.

11. The applicant urged in the new specification, Column 5, lines 1–8, that,

"In sum, the sleeve S will therefore yield to bending or arching pressures relatively readily at its broad end. As the bending continues and the effects of the bending forces shift progressively towards the free end of sleeve S, they will encounter increasingly greater resistance and will generally react in the manner suggested by Fig. 10 wherein are shown the forms successively assumed by the sleeve S as it is being arched."

And this proposition of greater resistance to bending at the smaller, free end was emphasized and used to differentiate prior art in the applicant's amendment of November 13, 1967, and in the amendment of February 8, 1968.

12. As a further distinction over prior art cited by the Examiner, the applicant's solicitor, in the November 13, 1967 amendment, urged that the application called for "washers" and that "[i]t will be appreciated that the axial cross-sectional dimension of a washer is very small in comparison with its radial cross-sectional dimension. . . ." This was redeclared in a latter part of the same amendment to be a basic difference between the application and prior art.

*The Accused Device*

13. The accused Belden strain relief device includes a sleeve which tapers from a wider end adjacent the appliance to a narrower end displaced therefrom.

14. However, in contrast to the device described in plaintiff's patent, the washer-like elements in the Belden device are equal or greater in axial length than in radial width. That is, the axial cross-sectional dimension is equal or larger in comparison with the radial cross-sectional dimension, and not "very small" in comparison with it as provided in the Koehler patent's file history.

15. Actual tests conducted in the courtroom did not prove conclusively that either the Belden device or the Koehler device is more resistant to bending forces at or near the narrow end of the strain relief sleeve than it is at the wider end. Both bent in similar fashion to prior art devices.

*Prior Art*

16. There is a great deal of prior art in the field of strain relief devices, and much of it is very close to the patent in suit. It was well known long before the application for the '244 Koehler patent that to be economically feasible, a strain relief device must be designed to be fairly simple, inexpensive to fabricate, and durable, but without imparting undesirable properties to the electrical cord such as extreme rigidity or inflexibility. See, *e. g.*, the prior art U.S. Patent 3,051,774 issued August 28, 1962, upon an application by one Schelke. The Schelke, '774, patent discloses a tapered strain relief device molded from natural or synthetic rubber, plastic or like material. The illustrated embodiments of the '774 patent show pin-hole apertures extending through the molded sleeve giving it added flexibility. The specification discloses that flexibility increases in the direction of the narrow end and that additional flexibility may be obtained by increasing the number of apertures. The '774 specification further informs that the apertures need not be uniformly spaced nor of the pin-hole shape, but may be otherwise spaced and may be of any other suitable shape such as rectangular, square or wedge.

17. The U.S. Patent No. 3,093,432 which issued June 11, 1963, with the inventor designated as W. R. King, is relevant to the patentability of the invention claimed in plaintiff's patent. In the King '432 patent, a molded strain relief device is disclosed including an elongated tapered sleeve with slots extending radially from about a central electric cord to the circumference of the sleeve and axially staggered therealong. As is noted in the specification,

"These holes are radially disposed about the circumference of the sleeve and are axially staggered along the sleeve such that the sleeve may be characterized as a series of axially spaced thin wall rings which are joined by axially extending portions of the sleeve, to thereby provide the optimum in strain relief for all directions of bending of the cord."

18. The prior art Rottmann Patent No. 3,032,737, issued May 1, 1962, also shows a molded strain relief device having an elongated tapered sleeve. In the '737 patent, the sleeve includes a series of radially extending slots which may be likened to washer-like elements with narrow cross pieces or interconnecting means between adjacent elements and positioned in a staggered relationship along the length of the sleeve so as to increase the flexibility thereof.

19. The La Wall Patent No. 2,727,088, issued December 13, 1955, shows a strain relief device molded from rubber or other thermoplastic material onto an electric cord. The device is comprised of an elongated sleeve having a series of longitudinally spaced grooves as to form annular discs spaced axially along the sleeve. The drawings of the La Wall patent show a sleeve of uniform width, but it is noted in the specification that "other modifications will be suggested by this disclosure to those skilled in the art such as tapering down the diameter of the discs toward the free end of the tubular portion."

20. Similarly, the French Patent to Thomson-Houston, No. 1,290,933, granted March 12, 1962, discloses a strain relief device including a molded sleeve made from a plurality of axially spaced washer-like elements tightly engaged about an electric cord and which are interconnected by radially extending ribs. The washer-like elements in the illustrated sleeve are equal in diameter but the disclosure suggests that the diameter may be varied.

21. French Aro Patent No. 1,360,801, granted on April 6, 1964, is also relevant prior art to the plaintiff's patent. It shows a molded plastic strain relief including a large diameter ring located adjacent the appliance, a smaller diameter ring displaced therefrom, and a series of interconnected spirals between the two rings.

22. A further prior art development pertinent here is that of the strain relief, Model 507–1, developed by the Miller Electric Co. It was illustrated and offered for sale in the Miller catalog as early as April of 1963, which is prior to the date of plaintiff's invention in the United States. The Miller 507–1 strain relief device included a tapered sleeve molded onto an electric cord. The sleeve contained axially spaced circumferential slots disposed along the length thereof, thus providing a series of axially spaced elements with interconnecting means between adjacent elements.

*Differences Between Prior Art And Subject Patent*

23. There are no substantial differences between the prior art patents and Claim 1 of the Koehler patent at issue here. The Miller 507–1 strain relief is a resilient sleeve molded tightly about an enclosed electric cord. Axially spaced circumferential slots disposed along the Miller device serve to create a closely spaced, coaxial series of elements, each having a central aperture engaged about the electric cord and each deformable out of its radial plane upon bending of the cord. The circumferential slots also serve to provide resilient interconnecting portions between adjacent elements. As in the Koehler patent, the sleeve is tapered, with the radially wider end connected to the appliance, and the radially narrower end free. Thus Claim 1 reads upon the Miller device and there is no substantial difference [1] between the Miller 507–1 strain relief and Claim 1 of the plaintiff's patent.

24. The differences between the prior art Rottmann patent and the device of Claim 1 in plaintiff's patent are that the radial widths of the flanges of the washer-like elements in Rottmann do not decrease along the length of the strain relief sleeve and the washer-like elements are not tightly engaged about the cord inserted through the center aperture thereof. Rottmann does show, however, a series of thin annular elements in a closely spaced, coaxial relationship, each having a central aperture for disposition about an electric cord and together forming a sleeve thereabout. The Rottmann patent also shows resilient interconnecting means between adjacent annular elements located radially outwardly of the cord for transmitting and distributing local stresses throughout the length of the sleeve upon flexing of the cord. And each of the annular elements is deformable out of its radial plane upon flexing. The differences between the Rottmann patent and the Koehler patent here are not as important as the similarities, for the prior art King patent, the prior art La Wall patent and the Miller 507–1 device show annular elements or washers which are tightly engaged about a central electrical cord and the radial widths of which decrease along the length of the strain relief device.

25. The prior art King patent teaches a strain relief device having a series of thin walled ring elements disposed about a central electrical cord in closely spaced coaxial relationship so as to form a sleeve. Each ring has a central aperture tightly engaged about the electrical cord and constitutes a flange of the cord movable by and with the cord upon flexing. In addition, radially extending resilient interconnecting means between adjacent elements are shown which transmit and distribute local stresses throughout the length of the sleeve. The radial width of the flange of each ring also decreases in the direction of the free end of the device and each flange is deformable out of its radial plane upon bending of the cord. There is no substantial difference between the

---

1. The last clause of Claim 1 was shown to be misdescriptive of the Koehler structure, and, in any event, with respect to this clause the Koehler device bends in substantially the same manner as all of the prior art structures. Accordingly, this clause will not be considered in further discussion of the prior art applied to Claim 1.

prior art King patent and Claim 1 of the patent in issue here.

26. The La Wall patent shows a sleeve comprised of a series of closely spaced discs or washer-like elements in axial alignment, each element having a central aperture disposed securely about a central electrical cord and comprising a radially extending flange therefrom. The illustrated embodiments of the La Wall patent show a uniform flange width along the length of the strain relief device. However, it is noted in '088 at Column 4, lines 29–32, that a modification obvious to one skilled in the art would be "tapering down the diameter of the discs . . . toward the free end of the tubular portion. . . ." The only material element which the '088 patent lacks, as compared to Claim 1 of the Koehler patent, is resilient interconnecting means between adjacent annular elements. This, however, is clearly shown in the Miller 507–1 strain relief device, the prior art King patent, the prior art Rottmann patent and the prior art French Thomson patent.

27. The French Thomson patent shows a series of washer-like elements disposed along a central electric cord such that each washer-like element constitutes a radial flange movable by and with the cord upon flexing. Moreover, in the French Thomson patent, resilient interconnecting means which are located radially from the cord are disposed between adjacent washer-like elements for transmitting and distributing local stresses throughout the length of the strain relief device. In addition, the French Thomson patent teaches that the washer-like elements may vary in diameter. Thus, there is no substantial difference between the teaching of the French Thomson patent and the subject matter of Claim 1 of the Koehler patent.

28. All the various elements of Claim 1 of the plaintiff's patent are also shown in the French Aro patent, and there is no material difference between them. In that patent, a strain relief device is disclosed which has spiral washer-like elements assembled on an electric cord in spaced coaxial relationship, each element having a central aperture secured tightly upon the cord such that each washer-like element constitutes a radial flange of the cord movable by and with it. The resilient interconnecting means between the spaced washer-like elements is the same as the interconnecting means illustrated in Figure 11 of plaintiff's patent and, therefore, the resilient interconnecting means of the French Aro patent is located radially outwardly from the cord for transmitting and distributing local stresses throughout the length of the strain relief device. And like the patent in suit, the French Aro patent shows a decreasing radial width of the washer-like elements which are also movable out of their respective radial planes upon bending or flexing of the cord.

29. The Schelke Patent No. 3,051,774 also teaches the use of all the material elements of Claim 1 of plaintiff's patent. The '774 patent clearly discloses the use of slots of various shapes to separate washer-like elements and further notes that by increasing the number of slots or pin holes, that flexibility of the sleeve will increase. The Schelke patent discloses a tapered resilient strain relief sleeve molded about a central electric cord. Pin holes, or slots as suggested in the specification, define a series of closely spaced, coaxial washer-like elements, each of which has a central aperture secured about the cord and each of which forms a flange of the cord movable by and with it. Each washer-like element is deformable out of its radial plane upon flexing of the cord, and resilient interconnecting means between adjacent washer-like elements transmit stresses throughout the sleeve.

30. Claims 3, 4, 5 and 6 are dependent on Claim 1 and further define the washer-like elements and/or interconnecting means, but such additional definition is either shown in the prior art or is obvious.

31. This resilient material for the washer-like elements, as required in Claims 3, 4, 5 and 6 of the Koehler patent, is disclosed in the prior art King patent and the Rottmann patent and is suggested in the Schelke patent.

32. Moreover, the use of circumferentially or radially spaced narrow links for interconnection of adjacent washers, which is required in Koehler Claims 3 and 6, is also shown clearly in the prior art. See, for example, the Rottmann patent, and the French Thomson patent, the French Aro patent and the King patent.

*Level Of Ordinary Skill In The Art*

33. The level of skill in the strain relief art is substantial. The person having ordinary skill would have technical training, and would have experience in the molding of strain relief devices from rubber, plastic or similar resilient material. He would be knowledgeable in the techniques of testing strain relief devices and would be versed in the properties of such materials used for molding and would be able to apply the theories and rules of mechanics to such devices.

*Best Mode*

34. In the Koehler parent application, the only specific material disclosed for the strain relief is rubber. But the evidence presented at trial shows that at the time of filing his parent application Koehler believed that the best material for his device was polyvinyl chloride and that the advantages of his device were obtained from making it out of polyvinyl chloride. The only material that Koehler had used for his device was polyvinyl chloride, and in fact, he believed it doubtful that his device could be made of rubber.

*Patent Office Prosecution*

35. Noma has never manufactured or sold strain reliefs in the United States under the Koehler patent. The strain relief in suit has met with substantial commercial success in the United States.

36. In the continuation-in-part application which resulted in the Koehler patent, it was urged that the device described therein, contrary to the prior art, had increased resistance to bending at its free end, rather than increased flexibility in the direction of the free end, as was specifically noted in the parent application. The feature of a more rigid free end was relied upon to distinguish over prior art cited by the Patent Office which clearly taught that in a tapered sleeve flexibility increased in the direction of the free end.

37. Testimony of witnesses at trial, the prior art and actual tests conducted during trial indicated that a device constructed in accordance with the Koehler patent functions similarly to the prior art, and there is not increasingly greater resistance to bending at the free end of the strain relief.

38. During prosecution of the continuation-in-part application, it was necessary for Koehler to differentiate over prior art cited by the Patent Office. In respect to the prior art La Wall patent, it was urged that "the La Wall discs do not directly engage the cord as do the washers of the applicant" and that "[i]n La Wall the radial width of each of the washers 18 is constant and there is no tapering structure. . . ."

39. Figure 2 of the La Wall patent indicates that the washer-like elements therein directly engage the cord. Further it is noted at Column 4, lines 29–32 of La Wall that "[o]ther modifications will be suggested by this disclosure to those skilled in the art such as tapering down the diameter of the discs . . . toward the free end of the tubular portion."

40. In the Koehler prosecution, Koehler also tried to differentiate over the French Aro patent by arguing that "the Aro device is not assembled tightly on the cord" and "it [the Aro device] is not even intended to be a strain relief . . . but serves only to prevent pulling out of the ends of the electrical cord." But the French Aro patent is

directed to a strain relief device, and it further provides that the device disclosed therein is fixed on the cord.

41. The major reasons for the granting of the Koehler patent are not apparent and there is no testimony of the Examiner or other Patent Office employee on this point.

42. Plaintiff had further alleged that defendant Belden engaged in unfair competition by copying Noma's strain relief device and by mismarking its strain relief device with the word "patented".

43. The plaintiff has completely failed in its burden of proof in showing any unfair competition by the acts stated above. Firstly, plaintiff has failed to show that there was a confidential relationship, express or implied, between itself and Sunbeam or that Sunbeam had otherwise promised not to disclose the strain relief to other parties.

44. Nor did Belden or employees of Belden obtain examples of plaintiff's strain relief device from Sunbeam by improper means. Plaintiff has also failed to prove that defendant Belden copied either the structure or the appearance of plaintiff's device.

45. The Court also finds that Belden owns a U.S. Design Patent No. 210,021, and two utility patents, U.S. Patent Nos. 3,051,774 and 3,259,680 and that Belden in good faith marked the word "PATENTED" upon its strain relief device believing that the features embodied therein were covered by at least one of such patents.

## CONCLUSIONS OF LAW

### Patent Validity

■ 1. Three basic conditions of patentability are novelty, utility and nonobviousness. 35 U.S.C. §§ 101, 102, 103.

■ 2. A patent is presumed valid and the alleged infringer has the burden of proving invalidity. 35 U.S.C. § 282.

■ 3. Although the presumption of validity is reinforced when the most pertinent prior art was relied upon in the Patent Office, the presumption is weakened, if not destroyed, when pertinent prior art has not been considered by the Patent Office. *Dunlop Co. v. Kelsey-Hayes Co.*, 484 F.2d 407, 413 (6th Cir. 1973); *Scott Paper Co. v. Fort Howard Paper Co.*, 432 F.2d 1198, 1203 (7th Cir. 1970); *Monroe Auto. Equipment Co. v. Superior Indus., Inc.*, 332 F.2d 473, 481 (9th Cir. 1964).

■ 4. In considering patentability a court should consider the volume of applications processed through the Patent Office and the *ex parte* nature of the proceedings therein. *Graham v. John Deere Co.*, 383 U.S. 1, 18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Lemelson v. Topper Corp.*, 450 F.2d 845, 849 (2d Cir. 1971); *Windmoller v. Laguerre*, 289 F.Supp. 178, 182 (D.D.C.1968).

■ 5. In any event, the validity of a patent cannot be made irrefutable by piling presumption on top of presumption. This Court must review all the evidence and make an independent determination of validity. *Waldon, Inc. v. Alexander Mfg. Co.*, 423 F.2d 91, 93 (5th Cir. 1971); *Lemelson v. Topper Corp.*, 450 F.2d 845 (2d Cir. 1971); *H. K. Porter Co. v. Black & Decker Mfg. Co.*, 182 U.S.P.Q. 401, 411 (N.D.Ill. 1974).

■ 6. A patent is invalid if "the invention [claimed in the patent] was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention . . ." was made by the patentee in this country. 35 U.S.C. §§ 102(a), 104. Prior public knowledge or use by only a single person is sufficient to invalidate a patent. *Coffin v. Ogden*, 18 Wall. 120, 85 U.S. 120, 124–5, 21 L.Ed. 821 (1873); *Brush v. Condit*, 132 U.S. 39, 48–49, 10 S.Ct. 1, 33 L.Ed. 251 (1889); *Monroe Auto. Equip. Co. v. Heckethorn Mfg. & Supply*, 332·

F.2d 406, 414–16 (6th Cir. 1964); *George R. Churchill Co. v. American Buff Co.*, 365 F.2d 129 (7th Cir. 1966).

7. A patent is invalid if the invention [claimed in the patent] "was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the . . ." effective filing date of the patent. 35 U.S.C. § 102(b).

8. It is not necessary that the invention be placed "on sale" by the patentee. A placing "on sale" by a third party is sufficient to invalidate any patent that is subsequently obtained. *Hobbs v. U. S.*, 451 F.2d 849, 859–60 (5th Cir. 1971).

9. A patent is also invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made [in this country] to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. §§ 103, 104.

10. The criteria for determining obviousness or nonobviousness under Section 103 were set out by the Supreme Court as follows: "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

11. The Section 103 test of nonobviousness in combination cases is rather severe because of the difficulty and improbability of finding any inventive contribution from the combination of known elements. Something significant must be added by the combination to the total stock of knowledge. Each element must produce in combination with the other elements a surprising or synergistic result, *i. e.*, one which is not simply new but one which would not normally follow as a matter of course from the assembly of old elements, and without which no amount of practicality, usability or success can transform the relocation and sizing of old elements into elements of a patentable combination. *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 62–63, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 152–153, 71 S.Ct. 127, 95 L.Ed. 162 (1950); *Windmoller v. Laguerre,* 289 F.Supp. 178, 181–82 (D.D.C.1968).

12. Mere change in form, shape or arrangement does not create patentability. *Scaramucci v. Dresser Indus., Inc.*, 427 F.2d 1309, 1317 (10th Cir. 1970); *National Connector Corp. v. Malco Mfg. Co.*, 392 F.2d 766, 770–71 (8th Cir 1968).

13. The patentee cannot support the patent by the fact that its actual device, as made and sold, may be superior in ways not related to, or not shown to follow from, the patent claims. The factors which make the device popular must flow from the patent claims rather than from other aspects. *Julie Research Laboratories, Inc. v. Guildline Instruments, Inc.*, 501 F.2d 1131, 183 U.S.P.Q. 1, 4 (2d Cir. 1974).

14. When an incorrect or questionable theory of operation is included in a patent claim, that claim is invalid. 35 U.S.C. § 112; *Graver Tank v. Linde Air Prod.*, 336 U.S. 271, 277–79, 69 S.Ct. 535, 93 L.Ed. 672 (1948), *affirming* 86 F.Supp. 191, 197 (N.D. Ind.1947).

15. A patent is also invalid if it does not meet the "best mode" requirement of 35 U.S.C. § 112, and failure to disclose the preferred material for construction of the alleged invention is a fatal deficiency in meeting the "best mode" requirement. *Dale Electronics, Inc. v. R. C. L. Electronics, Inc.*, 488 F.

2d 382, 389 (1st Cir. 1973) ; *Intermountain Research Co. v. Hercules, Inc.,* 171 U.S.P.Q. 577, 628 (C.D.Cal.1971).

*Infringement*

■ 16. The burden of proof is on the patentee to prove infringement by a preponderance of evidence. *Becker v. Webcor, Inc.,* 289 F.2d 357, 360 (7th Cir. 1961).

■ 17. In patent law the claims measure the invention, the claims must be construed in light of the specifications, the prior art, and the file history, *United States v. Adams,* 383 U.S. 39, 48–49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966) ; *Graham v. John Deere Co.,* 383 U.S. 1, 17–26, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) ; *Shepard v. Carrigan,* 116 U.S. 598, 6 S.Ct. 493, 29 L.Ed.2d 723 (1886) ; *Texas Co. v. Globe Oil & Refining Co.,* 225 F.2d 725, 735 (7th Cir 1955), and means other than those described in the specifications (or their equivalent) of an entirely different characteristic do not infringe by bringing about the same results. *Westinghouse v. Boydan Power Brake Co.,* 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136 (1898) ; *Leach v. Badger Northland, Inc.,* 385 F.2d 193, 197 (7th Cir. 1967) ; *Decca Ltd. v. United States,* 420 F.2d 1010, 1014, 190 Ct. Cl. 454 (1970).

■ 18. When the function of an element of the invention is part of the patent claim, the accused device must function in the same way for infringement to occur. *Fredman v. Harris-Hub,* 311 F.Supp. 734, 741 (N.D.Ill.1969).

*Attorney's Fees*

■ 19. The patent law provides that in exceptional cases, attorney's fees may be awarded to the prevailing party, 35 U.S.C. § 285, based upon the considered discretion of the court. This is not such an exceptional case.

*Unfair Competition*

■ 20. Absent palming off, an action for unfair competition for copying the appearance of a device cannot be maintained unless there is a valid design patent protection. *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 238, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964) ; *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed. 2d 661 (1964).

■ 21. The inspection of a device circulating in the channels of commerce and not covered by a confidential or nondisclosure agreement is not improper. 2 R. Callman, *Unfair Competition, Trademarks and Monopolies* § 53.3 (1968).

■ 22. 35 U.S.C. § 292 is a penal statute and is to be strictly construed. Any failure to show the prerequisites for liability is fatal. *Brose v. Sears, Roebuck & Co.,* 455 F.2d 763, 765 (5th Cir. 1972). Requisites for liability under § 292 include that the advertising or use of the word "patented" be made in conjunction with a device which is not patented, 35 U.S.C. § 292; *Brose v. Sears, supra; Ansul v. Uniroyal,* 306 F. Supp. 541, 565–66 (S.D.N.Y.1969), and an intent to deceive. But when a party has design or utility patents which *prima facie* cover the accused device and have not been declared invalid and are entitled to a presumption of validity, a mere allegation of invalidity is insufficient to meet the heavy burden of proving intent to deceive under § 292. *Esco Corp. v. Hensely Equip. Co.,* 265 F.Supp. 863, 873 (N.D.Cal.1965) ; *Brose v. Sears, Roebuck & Co.,* 455 F.2d 763, 768 (5th Cir. 1972) ; *Prelin Indus., Inc. v. G & G Crafts, Inc.,* 175 U.S.P.Q. 744, 752, 755 (W.D.Okl.1972).

■ 23. When there is no "designation of origin" at issue, and no "description" at issue, and no "representation" at issue within the meaning of 15

U.S.C. § 1125(a), there is no cause of action under 15 U.S.C. § 1125(a). *D & S Plug Corp. v. Colvin Motor Parts, Inc.*, 171 U.S.P.Q. 680, 683 (S.D.N.Y.1971).

*Conclusions*

■ 24. This court finds that the presumption of validity is rebutted and Claims 1, 3, 4, 5 and 6 of the Koehler patent are invalid, failing to meet the requirements of 35 U.S.C. §§ 102 and 103. The prior art, especially the King patent, show all the material elements of the pertinent claims in the plaintiff's patent. Plaintiff did not, or could not, distinguish the prior art.

25. If there are any differences between the patent claims in issue and the prior art, this court finds that these differences are such that the subject matter claimed in plaintiff's patent is obvious to one skilled in the art, and is invalid under 35 U.S.C. § 103.

■ 26. The "best mode" for constructing the Koehler device was not disclosed in the patent in accordance with 35 U.S.C. § 112, and the patent is invalid.

■ 27. An invalid patent cannot be infringed, and the defendant's device does not infringe any of the claims of the Koehler patent '244.

28. The Belden strain relief does not operate in the manner required by the claims of plaintiff's patent, for the smaller end of the sleeve is not more resistant to deformation than the broader end.

29. To construe the washer-like elements of the Koehler patent in a manner which results in infringement by the Belden device would conflict with distinctions made in the file wrapper history, and the Koehler patent would read on the prior art.

■ 30. This court finds and concludes that defendant Belden is not guilty of any unfair competition. Plaintiff has failed to prove that Belden copied its device or that Belden in any way interfered with its business relationships with Sunbeam, which were not conducted under any cloak of secrecy or trust, express or implied, but were open commercial transactions. The marketing of its strain relief device with the word "patented" does not comprise unfair competition or mismarking under 35 U.S.C. § 292 or under the Lanham Act, which latter issue plaintiff did not press or offer sufficient proof of at trial.

31. Defendants are entitled to costs in this case.

## JUDGMENT ORDER

This cause having been considered by this court upon the pleadings and evidence presented at trial and upon the findings of fact and conclusions of law entered by this court,

It is ordered, adjudged and decreed:

1. That Claims 1, 3, 4, 5 and 6 of United States Letters Patent No. 3,395,244, which issued July 30, 1968, are invalid.

2. That Defendants, Westinghouse Electric Corporation, The May Department Stores Company, The Hecht Company, Valentine's Appliance Service, and Belden Corporation, have not infringed or induced infringement of said Letters Patent No. 3,395,244.

3. That Defendant Belden Corporation has nowise engaged in unfair competition with Plaintiff, Noma Lites of Canada, and has not used any unfair competitive practices in the design and marketing of the accused strain relief device.

4. That Plaintiff's complaint and counterclaim are hereby dismissed with prejudice and with costs to defendant.